James E. SWANN et al., Plaintiffs,

v.

The CHARLOTTE-MECKLENBURG BOARD OF EDUCATION et al., Defendants.

Civ. A. No. 1974.

United States District Court, W. D. North Carolina, Charlotte Division.

Aug. 3, 1970.

Conrad O. Pearson, Durham, N. C., J. LeVonne Chambers, Adam Stein, James E. Ferguson, II, and James E. Lanning, Charlotte, N. C., Jack Greenberg, James M. Nabrit, III, and Norman Chachkin, New York City and Gaston H. Gage and Paul L. Whitfield, Charlotte, N. C., for plaintiffs.

Brock Barkley, William J. Waggoner, Weinstein, Waggoner, Sturges & Odom, Benjamin S. Horack, Ervin, Horack & McCartha, Whiteford S. Blakeney, and William H. Booe, Charlotte, N. C., for defendants.

## MEMORANDUM OF DECISION AND ORDER

McMILLAN, District Judge.

### INDEX

| | | Page |
|---|---|---|
| I. | SUMMARY | — |
| II. | BRIEF HISTORY OF PROCEEDINGS | — |
| III. | THE EXTENT OF CONTINUED SEGREGATION—AND ITS RESULTS | — |
| IV. | THE LEGAL BASIS FOR DESEGREGATION: | — |
| | A. Segregated public schools are unconstitutional. | — |
| | B. "Racial balance" is not required by this court. | — |
| | C. "Bussing" is still an irrelevant issue. | — |
| | D. This is a local case in a local court—a lawsuit—to test the constitutional rights of local people. | — |
| | E. The issue is not the validity of a "system," but the rights of individual people. | — |
| | F. The issue is one of Constitutional Law—Not Politics. | — |
| | G. The duty to desegregate schools does not depend upon the Coleman report, nor on any particular racial proportion of students. | — |
| V. | THE REASONABLENESS OF THE SPECIFIC METHODS AND THE OVERALL PLANS AVAILABLE TO DESEGREGATE THE BLACK CHARLOTTE SCHOOLS. | — |
| | A. The facts under which any question of "reasonableness" must be judged. | — |
| | B. Reasonableness of methods. | — |
| | C. The various plans. | — |
| | 1. The ⅝ Majority Board Plan. | — |
| | 2. The HEW plan. | — |
| | 3. The court order of February 5, 1970, including the Finger Plan. | — |
| | 4. The ⅘ Minority Board Plan. | — |
| | 5. An earlier draft of the Finger plan. | — |
| VI. | A RESERVATION CONCERNING REASONABLENESS VERSUS CONSTITUTIONAL RIGHTS | — |
| | ORDER | — |

## I.

## SUMMARY

Pursuant to the mandates of the Supreme Court of the United States and the Fourth Circuit Court of Appeals, further hearings (eight days of them) have been conducted July 15–24, 1970, regarding methods for desegregation of the public schools of Charlotte and Mecklenburg County, North Carolina, and the known plans for desegregation of the elementary schools have been reconsidered.

The court again finds as a fact that compliance with all parts of the desegregation order for senior high, junior high and elementary schools now in effect will require, at the most, transportation of 13,300 children on 138 busses.

The elementary portion of the order will require, at the most, transporting 9,300 children on 90 busses. The defendants already own or control at least 80 safely operable busses not in use on regular routes, *and* they expect early delivery of 28 more new ones. Such busses as may be needed beyond these 108 can be borrowed for a year without cost from the State.

No capital outlay will be required this year to comply with the court's order. The School Board and the county government have ample surplus and other funds on hand to replace with new busses as many of the used busses as 1970–71 experience may show they actually need. If they have to buy 120 new ones, at $5,500 each, the cost will approach $660,000, which is less than the cost of two days' operation of the schools.

Regardless of any order of this court, all children assigned to any school more than 1½ miles from home are, under state law and regulation, now entitled to bus transport.

The ¾ School Board majority have not obeyed the orders of the Circuit Court to prepare a new plan for elementary schools in place of their rejected plan. The court ordered plan for all schools has been in effect since June 29, 1970 under the mandate of the Supreme Court.

The School Board has not used all reasonable means to desegregate the elementary schools.

At least three reasonable plans are available to the Board: (1) the court ordered (Finger) plan; (2) the ⅘ minority Board ("Watkins") plan; and (3) an earlier draft of the Finger plan.

The Circuit Court directed this court to have a plan in effect for the opening of school in the fall, and the Supreme Court on June 29, 1970 put this court's February 5 order back into effect pending these proceedings. The court ordered (Finger) plan is the only complete plan before the court, and it is a reasonable plan. The Board is herein directed to put the court ordered plan (with authorized modifications, if desired) into effect with the opening of school in the fall, unless they exercise the options set out herein to adopt the ⅘ minority Board plan (the "Watkins" plan) or an earlier draft of the Finger plan, or any combination of these three plus excerpts from the HEW plan, which complies with the directives in the February 5 order. The Board is directed to notify the court in writing by noon on August 7, 1970, as to the course of action which it has voted to follow.

Board plans for desegregation of the faculties of all schools and of the student bodies of the senior high schools and the junior high schools are approved.

## II.

## BRIEF HISTORY OF PROCEEDINGS.

On April 23, 1969, after lengthy hearings and research, an order was entered that the defendants submit a plan for the desegregation of the schools of Charlotte and Mecklenburg County, North Carolina, to be predominantly effective in the fall of 1969, and to be completed by the fall of 1970. Among other things the court found that under North Carolina law there is no "freedom of choice" to attend any school; that the Board of Education has the total control over the assignment of students to schools; and that residence has never created a right

to attend a particular school. It was further found that all the black and predominantly black schools of this school system are illegally segregated. The November 7, 1969 opinion contained detailed guidelines for desegregating this particular group of schools, and included the following findings:

"The black schools are for the most part in black residential areas. However, that does not make their segregation constitutionally benign. In previous opinions the facts respecting their *locations*, their *controlled size* and their *population* have already been found. Briefly summarized, these facts are that the present location of white schools in white areas and of black schools in black areas is the result of a varied group of elements of public and private action, all deriving their basic strength originally from public law or state or local governmental action. These elements include among others the legal separation of the races in schools, school busses, public accommodations and housing; racial restrictions in deeds to land; zoning ordinances; city planning; urban renewal; location of public low rent housing; and the actions of the present School Board and others, before and since 1954, in locating and controlling the capacity of schools so that there would usually be black schools handy to black neighborhoods and white schools for white neighborhoods. There is so much state action embedded in and shaping these events that the resulting segregation is not innocent or '*de facto*,' and the resulting schools are not 'unitary' or desegregated."

Segregation of black children into black schools is *not* because of residential patterns, but because of assignment and other policies of the School Board, including the call upon segregated housing and school site selection to lend respectability to those policies.

(There is appended hereto an 18-page exhibit listing approximately 65 sections of the General Statutes of North Carolina and 2 sections of its Constitution under which the segregation of the black race in North Carolina has been the policy of our Constitution and the letter of our statutes for many years. Many of these provisions were repealed by the 1969 General Assembly, but most of them were still on the books when the April 23, 1969 opinion was written.)

A consultant, Dr. John A. Finger, Jr., was appointed by the court in December, 1969, to draw a desegregation plan after it became apparent that the defendants had no such plan and had not resolved to prepare one which would desegregate the schools. The development of the plan is described in the order of February 5, 1970, the supplemental historical memorandum of March 21, 1970, and the supplemental findings of fact dated March 21, 1970. Briefly stated, the court appointed consultant prepared plans for the desegregation of all the black schools. Faced with the imminent existence of valid desegration plans, the Board then went to work and prepared some plans of its own.

This court approved the Board's plan for senior high schools (with one minor change); it gave the School Board a choice of several plans or procedures as to junior high schools; and it disapproved the Board's plan for elementary schools, because it left half the black children in black schools, and ordered into effect one of the plans designed by the consultant, Dr. Finger, for desegregation of the elementary schools.

The Circuit Court of Appeals granted a stay as to the elementary schools and the Supreme Court left the stay in effect. The district court then, in the order of March 25, 1970, postponed until September 1, 1970, the implementation of the plans for junior and senior high schools because the stays issued by the Circuit Court and the Supreme Court had taken off the pressure for mid-year 1969–70 desegregation.

Before the appeal to the Fourth Circuit was concluded, the defendants, including the Governor and the State Board of Education, voiced strenuous opposition to compliance with the court order, basing

their objections in part upon parts of the 1964 Civil Rights Law and upon North Carolina's "anti-bussing law" which had been passed by the General Assembly a few weeks after this court's original April 23, 1969 order. A three-judge court was convened and has met and has decided that the "anti-bussing law" in pertinent part is unconstitutional, and eventually issued appropriate injunctions.

The Circuit Court of Appeals then issued its opinion on May 26, 1970. It affirmed the principal findings of fact and legal conclusions of the district court, including the finding that the segregated residential housing upon which the defendants relied for defense was caused by forces deriving their basic strength from governmental action. It (1) approved the desegregation of faculties, (2) approved the plans for desegregation of junior high schools, and (3) approved the plans for desegregation of senior high schools all as ordered by the district court. It expressly *dis*approved the Board's plan for elementary schools because it left half the black elementary children in "black" schools, and it remanded the matter for the school board to prepare a new plan using all reasonable means of desegregation, and for the district court to reconsider the assignment of elementary pupils under a theory of "reasonableness." The district court was directed to put a plan into effect for the fall term 1970.

The Supreme Court on June 29, 1970, 399 U.S. 926, 90 S.Ct. 2247, 26 L.Ed.2d 791, entered an order reading in pertinent part as follows:

"* * * The petition for a writ of certiorari * * * [is] granted, provided that the judgment of the Court of Appeals is left undisturbed insofar as it remands the case to the district court for further proceedings, which further proceedings are authorized, and the district court's judgment is reinstated and shall remain in effect pending those proceedings."

At the July 15–July 24 hearings the defendants announced that:

(a) Faculties have been assigned for all schools according to the February 5, 1970 order, so that when schools open in September all faculties will have about 75% white teachers and about 25% black teachers;

(b) The senior high schools will be desegregated this fall in accordance with the plan previously approved by the district court and by the Circuit Court;

(c) The junior high schools will be desegregated this fall in accordance with the plan previously approved by the district court and by the Circuit Court; and

(d) As to elementary schools the majority of the defendants have no official plan and no plan of action for desegregation except the plan, previously rejected by both district court and the Circuit Court, which would leave half the black elementary children in segregated schools.

Since the school board has refused to obey the Circuit Court's instructions to file a new elementary plan by June 30, 1970, it might, were this an ordinary case, have no standing to be heard further. However, the case affects numerous people who, though not Board members, are entitled to have the matter further considered as fully and fairly as possible.

This court has tried to follow faithfully the orders of the Supreme Court and the Circuit Court. This presents some unique problems; the Circuit Court's "reasonableness" order is vague; the Supreme Court's order allowing certiorari is cryptic, and raises and leaves unanswered several major questions; neither order is a clear guide for this court. However, this court believes that, regardless of the Board's continued default, this court's duty is to reconsider the elementary desegregation problem in view of the questions whether the methods previously required by the court are reasonable and whether the Board has exhausted all reasonable methods available to it.

## III.

### THE EXTENT OF CONTINUED SEGREGATION—AND ITS RESULTS.

The schools are still segregated as described in this court's memorandum opinion of November 7, 1969. Over 9,000 black children attend schools that are 100% black. Two-thirds (16,000) of the black children still attend racially identifiable "black" schools. Fifty-seven schools are "white" and twenty-five are predominantly "black."

The tangible results of segregation continue to be apparent from the 1969–70 Stanford Achievement Tests in Paragraph Meaning and Arithmetic, given during the sixth month of school, for grades 3, 6, 8 and 10. In "black" schools third graders perform at first grade or early second grade levels, while their contemporaries at "white" schools perform at levels generally from one to two grades higher. Sixth graders in black schools (Double Oaks and Bruns Avenue, for example) perform at third grade levels while their contemporaries at Olde Providence, Pinewood, Lansdowne and Myers Park perform at seventh or eighth grade levels. In the eighth grade we see Piedmont Junior High students reading at early fifth grade levels while their cntemporaries at McClintock and Alexander Graham read at early ninth grade levels. In the tenth grade, on a scale where the *average* is 50, the black high school, West Charlotte, had English scores of 38.30 and mathematics scores of 35.89; Harding, nearly half black, had scores of 42.89 and 40.76; while the obviously "white" schools had scores ranging from 43.2 to 52.2. At First Ward Elementary School only two black *third* graders out of 119 tested scored as high as third grade, while 100 were still at first grade level of proficiency as to paragraph meaning.

Of factors affecting educational progress of black children, segregation appears to be *the factor under control of the state* which still constitutes the greatest deterrent to achievement.

## IV.

### THE LEGAL BASIS FOR DESEGREGATION.

■ A. *Segregated public schools are unconstitutional.* — Desegregation is based on the Constitution as interpreted in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), where the Supreme Court said:

" 'Segregation of white and colored children in public schools has a detrimental effect upon the colored children. The impact is greater when it has the sanction of the law; for the policy of separating the races is usually interpreted as denoting the inferiority of the Negro group. A sense of inferiority affects the motivation of a child to learn. *Segregation with the sanction of law, therefore, has a tendency to [retard] the educational and mental development of Negro children and to deprive them of some of the benefits they would receive in a racial-[ly] integrated · school system.'*

\*      \*      \*      \*      \*      \*

"We conclude that in the field of public education the doctrine of 'separate but equal' has no place. *Separate educational facilities are inherently unequal.* \* \* \*." (Emphasis added.)

Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968) placed upon school boards the burden

"\* \* \* to come forward with a plan that promises realistically to work, and promises realistically to work *now,*" [and]

" \* \* \* to convert promptly to a system without a 'white' school and a 'Negro', school, *but just schools."* (Emphasis added.)

The principal difference between New Kent County, Virginia, and Mecklenburg County, North Carolina, is that in New Kent County the number of children being denied access to equal education was only 740, whereas in Mecklenburg that number exceeds 16,000. If *Brown* and *New Kent County* and Griffin v. County

School Board of Prince Edward County, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 and Alexander v. Holmes County, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 are confined to small counties and to "easy" situations, the constitutional right is indeed an illusory one. A black child in urban Charlotte whose education is being crippled by unlawful segregation is just as much entitled to relief as his contemporary on a Virginia farm.

■ B. *"Racial balance" is not required by this court.* — The November 7, 1969 order expressly contemplated wide variations in permissible school population; and the February 5, 1970 order approved plans for the schools with pupil populations varying from 3% at Bain Elementary to 41% at Cornelius. This is not racial balance but racial diversity. The purpose is not some fictitious "mix," but the compliance of this school system with the Constitution by eliminating the racial characteristics of its schools.

C. *"Bussing" is still an irrelevant issue.* — Until the end of the 1969–70 school year, state law and regulations authorized bus transportation for almost all public school children who lived more than 1½ miles from the school to which they were assigned. The excluded few were those inner-city children who both lived and attended school within the old (pre-1957) city limits.

If an inner-city child was assigned to a suburban or a rural school, or if a rural or suburban child was assigned to an inner-city school, he *was* entitled to bus transport.

Under those regulations, virtually all the children covered by the court order of February 5, 1970, were entitled to bus transport under *then existing* state regulations *even if the order of this court had not mentioned transportation.*

In Sparrow v. Gill, D.C., 304 F.Supp. 86 (1969), a three-judge federal court ordered an end to the discrimination against the inner-city children (and thereby in effect ordered bus transport for those children) by requiring the school authorities to discontinue trans-port for suburban children unless they also offered it to inner-city children.

The state authorities have announced intention and promulgated rules to comply with this decision by providing transport on the usual basis for *all* city children who live over 1½ miles from school.

The local School Board, in its last plan for partial elementary desegregation, stated that

"Transportation will be provided to and from school for all students who are entitled thereto under state law and applicable rules and regulations promulgated by the State."

(Without such transportation even the Board's own plan would have left children, in numbers they estimate at nearly 5,000, assigned to schools too far away to reach.)

In view of the above facts, every child assigned to any school over 1½ miles from his home is entitled to bus transportation in North Carolina.

The issue is not, "Shall we bus children?" but "Shall we *withhold* transportation already available?"

In Griffin v. Prince Edward County, 377 U.S. 218, 84 S.Ct. 1226 (1964), the Supreme Court held that a county could be required to recreate an entire public school system rather than keep it closed to avoid desegregation. The same principle would seem to apply here.

D. *This is a local case in a local court —a lawsuit—to test the constitutional rights of local people.*—The *principles* which outlaw racial discrimination in public schools certainly are of nationwide application, but the *facts* and results may vary from case to case. This is a local suit involving actions of the State of North Carolina and its local governments and agencies. The facts about the development of black Charlotte may not be the facts of the development of black Chicago or black Denver or New York or Baltimore. Some other court will have to pass on that problem. The decision of the case involves local history, local statutes, local geography, local demography, local state history including

half a century of bus transportation, local zoning, local school boards—in other words, local and individual merits.

This court has not ruled, and does not rule that "racial balance" is required under the Constitution; nor that all black schools in all cities are unlawful; nor that all school boards must bus children or violate the Constitution; *nor that the particular order entered in this case would be correct in other circumstances not before this court.*

The orders of this court have been confined to the only area they can properly embrace, and that is *the rights of the particular parties represented in this case, on the particular facts and history of this case.*

E. *The issue is not the validity of a "system," but the rights of individual people.*—If the rights of citizens are infringed by the system, the infringement is not excused because in the abstract the system may appear valid. "Separate but equal" for a long time was thought to be a valid system but when it was finally admitted that individual rights were denied by the valid system, the system gave way to the rights of individuals.

F. *The Issue Is One Of Constitutional Law—Not Politics.*—At the hearings the defendants offered public opinion polls and testimony that parents don't like "bussing," and that this attitude produces an adverse educational effect upon the minds of the children. The court has excluded such evidence, and must continue to proceed unaffected, if possible, by this and other types of political pressure and public opinion.

This is not out of disregard for the opinions of neighbors. A judge would ordinarily like to decide cases to suit his neighbors. Furthermore, as first suggested on August 15, 1969, it may well be that if the people of the community understood the facts, as the court has been required to learn and understand them, they would reach about the same conclusions the court has reached.

To yield to public clamor, however, is to corrupt the judicial process and to turn the effective operation of courts over to political activism and to the temporary local opinion makers. This a court must not do.

In the long run, it is true, a majority of the people will have their way. The majority must be a majority of the pertinent voting group. As our slave-owning grandfathers of the South learned in 1865, the pertinent voting group on constitutional matters includes the people and their elected representatives from the nation at large, not just the South, and not just Mecklenburg County. Methods exist to amend the Constitution. If the Constitution is amended or the higher courts rule so as to allow continued segregation in the local public schools, this court will have to be governed by such amendment or decisions. In the meanwhile, the duty of this and other courts is to seek to follow the Constitution in the light of the existing rulings of the Supreme Court, and under the belief that the constitutional rights of people should not be swept away by temporary local or national public opinion or political manipulation.

Civil rights are seldom threatened except by majorities. One whose actions reflect accepted local opinion seldom needs to call upon the Constitution. It is axiomatic that persons claiming constitutional protection are often, for the time being, out of phase with the accepted "right" thinking of their local community. If in such circumstances courts look to public opinion or to political intervention by any other branch of the government instead of to the more stable bulwarks of the Constitution itself, we lose our government of laws and are back to the government of man, unfettered by law, which our forefathers sought to avoid.

Lord Edward Coke, Chief Justice of the Court of Common Pleas of England, may have summed it up when in 1616 he wrote, responding to a peremptory demand from the King's attorney general,

that he must deny the King's request because under his oath his obligation was that he

" * * * shall not delay any person of common right for the letters of the King or of any person nor for any other cause * * *."

G. *The duty to desegregate schools does not depend upon the Coleman report, nor on any particular racial proportion of students.*—The essence of the *Brown* decision is that segregation implies inferiority, reduces incentive, reduces morale, reduces opportunity for association and breadth of experience, and that the segregated education itself is inherently unequal. The tests which show the poor performance of segregated children are evidence showing one result of segregation. Segregation would not become lawful, however, if all children scored equally on the tests.

Nor does the validity of *Brown* depend upon whether the system contains ideal proportions of black and white students. The Charlotte-Mecklenburg system does contain a theoretical "ideal" 70–30 proportion of white and black students. This has some bearing upon the reasonableness of any particular local plan or part of such plan. However, it does not give rise to any legitimate contention that *Brown* may be ignored where you cannot have at least 60% or 70% white children in a school. The HEW plan providing for 57% black students in a group of schools may well be constitutional in some other system, though unconstitutional in Mecklenburg where a school 57% black is immediately racially identifiable as a "black" school.

V.

THE REASONABLENESS OF THE SPECIFIC METHODS AND THE OVERALL PLANS AVAILABLE TO DESEGREGATE THE BLACK CHARLOTTE SCHOOLS.

A. *The facts under which any question of "reasonableness" must be judged.*—From the lengthy and largely repetitious testimony at the July 15–24 hearings, and from previous evidence, the following facts bearing on "reasonableness" are found:

1. In North Carolina the school bus has been used for half a century to transport children to *segregated consolidated* schools. Last year 610,000 children, comprising nearly 55% of the state's public school population, were transported daily on school busses. With the 1970 extension of transportation to inner-city children, the average daily school bus population of North Carolina this September will reach perhaps three-fifths of all public school children. Those eligible for transport are far more numerous. The "anti-bussing law" has been held unconstitutional.

2. Some 70.9% of these bussed children are in the first eight grades. There may be more first graders than children of any other age riding school busses.

3. The academic achievement tests quoted in this and previous orders show that the later desegregation is postponed in this school district the greater the academic penalties are for the black children. By the sixth grade the performance gap is several grades wide. By the eighth grade it may be four grades wide.

4. School bus transportation is safer than any other form of transportation for school children.

5. The defendants have come forward with no program nor intelligible description of "compensatory education," and they advance no theory by which segregated schools can be made equal to unsegregated schools.

6. In Charlotte-Mecklenburg approximately 23,300 children in grades one through twelve (plus more than 700 kindergarten children, ages four and five) ride some 280 school busses to school every day. The school bus routes for the four and five year olds vary from seven miles to thirty-nine miles, one way. The average one way bus route in the system today is about an hour and fif-

teen minutes. Average daily bus travel exceeds forty miles.

7. Approximately 5,000 children of all ages rode public transportation (City Coach Company) every day of the 1969–70 school year at reduced fares, or 20¢ a day (10¢ each trip).

8. The State Department of Public Instruction has announced that it will pay for transportation of children on city bus systems or by other contract carriers at whatever rate may be approved by the North Carolina Utilities Commission. City Coach Company has requested a fare increase. City Coach has indicated a capacity to transport between 6,000 and 7,000 pupils daily if they get fares and routes satisfactorily established.

9. There are only two adult male drivers out of some two hundred and eighty regular bus drivers who drove school busses during the 1969–70 school year, and only about seventeen adult women who drove kindergarten school busses during that year. The other 260-plus drivers are boys and girls, 16, 17 and 18 years old.

10. There is no black residential area in this school system which is so large that the students can not be afforded a desegregated education by reasonable means. The additional length of travel required to implement the best available plans for desegregating the system is less than the average distance of bus transportation now being provided elementary children under existing bus practices, and the travel times are less than times required by existing bus routes.

11. The offer of transportation to encourage "freedom of choice" is ineffectual. It was expressly ordered by this court on April 23, 1969, and put into effect by the defendants in the fall of 1969; and it has had no substantial effect upon the exercise by black children of freedom of choice to go to white schools.

12. There is no "intractable remnant of segregation" in this school system. No part of the system is cut off from the rest of it, and there is no reasonable way to decide what remnant shall be deemed intractable.

13. The regular bus routes are about 280 in number, including 17 bus routes transporting four and five-year-old children to child development centers (kindergartens).

14. Up until the July 15, 1970 hearings, the defendants had allowed the court to believe they only had 280 busses plus a few spares. On the last day of the hearing, however (July 24, 1970), some amazing testimony was developed on cross-examination of the witness J. W. Harrison, the Transportation Superintendent. He testified and the court finds as facts that *in addition to* the 280 "regular" busses, the Board's bus assets include at least the following:

(i) Spare busses ............. 20
(ii) Activity busses (each driven less than 1,000 miles a year) .... 20
(iii) Used busses replaced by new ones in 1969–70 ........... 30
(iv) New busses currently scheduled for replacement purposes and expected to be delivered in near future ................... 28

Total: 107

15. It only requires, at the most, 138 busses to implement the court ordered plans for desegregation of all the high schools, junior high schools, and elementary schools in the county!

16. In addition to this, the State School Bus Transportation Department informed the local defendants in early 1970 that there were 75 new busses available to the local school system if they wanted them, out of the 400 new busses then held by the State.

17. As of July 18, 1970, it was stipulated that the State Board of Education had 105 new busses on hand and 655 new ones on order, of which some 289 had been manufactured.

18. It was stipulated that by September 1st the State Department of Educa-

tion would have approximately 400 second-hand busses on hand and available on loan, without cost, for local school boards to use in 1970–71.

19. According to Defendants' Exhibit 35, a letter of July 10, 1970 from the State Superintendent of Public Instruction to the Superintendent of the Charlotte-Mecklenburg school system:

"At the present time approximately 400 discarded busses are available at various school garages in the state *that could safely be used, if necessary,* on a temporary basis for the transportation of additional children." (Page 4) (Emphasis added.)

\* \* \* \* \* \*

"In the event discarded busses must be used on a temporary basis the state will expect a local school unit to replace the discarded bus pressed back into service as early as possible and at least by the beginning of the following fiscal year." (Page 6)

\* \* \* \* \* \*

"*We would request school units that hold title to these* [old] *busses to transfer the title without cost to the school unit needing to use these vehicles on a temporary basis.*" (Page 6) (Emphasis added.)

\* \* \* \* \* \*

"It would be the responsibility of the school unit requesting temporary use of old busses to put the old busses in good mechanical repair after they receive delivery of the bus." (Page 7)

20. The testimony of Mr. Harrison was that for a 54-passenger bus a set of new tires, if needed, would cost $324; a complete overhaul of the brakes with replacement of all rubber parts and working parts would cost about $25. (Mechanics are paid on a salary, not a commission, basis.)

21. The brakes, tires, lights and steering on any second-hand bus which might be put into service can be put into first-class safety condition for a figure per bus not exceeding $500. In the case of the busses already on hand in the Charlotte-Mecklenburg system, this

cost should be less, because the local system has an excellent preventive maintenance and parts replacement program and according to the transportation superintendent anticipates and makes repairs before trouble develops, rather than wait for breakdowns, so that the old rolling stock as well as the new is kept in good condition.

22. The transportation superintendent, Mr. Harrison, testified that he maintains, and now has, a manpower reserve of about 100 students who are qualified and available as school bus drivers, over and above the 280-odd regular drivers. More are now being trained.

23. The estimated school budget for the year 1970–71 is approximately $66,000,000, which is $8,000,000 more than the 1969–70 budget.

24. Of this $66,000,000 the amount of approximately $21,900,000 was allocated to the School Board by the county without restriction as to its use, and the School Board is free to use whatever part of it they find necessary to comply with court orders. (Blaisdell testimony.)

25. The Board's opinion evidence, including numerous exhibits, on numbers of pupils to be transported and numbers of extra busses required (526 for the entire system, 293 for elementary schools) can not be taken seriously. The pupil count was made by counting all pupils in each zone who live more than a mile and a *quarter* (not a mile and a *half*) from each school, and (with some minor but unspecified adjustments) treating all of these children as requiring transportation. This method fails to account for several factors such as (1) the 7% who are absent every day; (2) the pupils now riding City Coach busses; (3) the pupils now already receiving school bus transport; (4) those who go to school in private vehicles.

Moreover, by cutting the "walking distance" from the statutory figure of 1½ miles to 1¼ miles, the Board method reduces by 40% (from over seven square miles to just over five square miles) the area of the walking zone and thereby

sharply increases those eligible for bus transport.

In computing needed busses, the Board figures unwarrantedly assume: (1) that each bus can make only one round trip a day instead of the average of 1.8 round trips a day now made; (2) that each bus can only transport 46 pupils a day instead of the present average of 84.4; (3) that busses used in the desegregation program must be less efficient than the others.

All these assumptions are contrary to the evidence which, for example, shows that one "desegregation" bus (Bus #23, Exhibit 54) transported 99 children daily among schools as remote as Northwest Charlotte (9th and Bethune) on the one hand and Sharon Elementary and Beverly Woods Elementary, and Quail Hollow Junior High on the other, with the driver then going on in the bus to South High School.

The court's previous findings on these items are re-affirmed. Maximum numbers of pupils to be transported and additional busses needed, even if Sparrow v. Gill were not in the picture, remain:

|  | No. Pupils | No. Busses |
|---|---|---|
| Senior High | 1,500 | 20 |
| Junior High | 2,500 | 28 |
| Elementary | 9,300 | 90 |
|  | 13,300 | 138 |

(Board witnesses after refining lines and making actual pupil assignments now say that the number of senior high pupils requiring transportation is 1,815 and the number of junior high pupils requiring transportation is 2,286.)

26. All plans which desegregate all the schools will require transporting approximately the same number of children. In overall cost, if a zone pupil assignment method is adopted, the minority Board plan may be a little cheaper than the Finger plan.

27. Mecklenburg County had a July 31, 1970 surplus or "carry-forward" of approximately four million dollars, of which one million dollars was completely free of any allocation or budgeting commitment.

28. North Carolina, whose biennial 1969–71 budget is $3,590,902,142.00, regularly has a biennial surplus of many millions of dollars.

29. The annual cost of pupil transportation is approximately $20 a year per pupil; the state pays it all, except for certain minor local administrative costs, and the original purchase of the first bus for a route; thereafter, the state replaces the bus periodically. Earlier findings that the cost was $40 per pupil per year were in error.

30. No capital outlay will be needed to supply busses for the 1970–71 school year. The state is ready and willing to lend the few busses the Board may need; replacements can be bought after actual need has been determined under operating conditions.

31. The $66,000,000 school budget amounts to about $366,667 a day for a 180-day school year. If the county eventually has to buy as many as 120 new busses, their cost, at $5,500 each, would be $660,000, which is less than the cost ($733,000) of two days of school operation.

32. *Age of children* has apparently never prevented their school bus transportation. There are, of course, more children between kindergarten and the sixth grade than there are in the higher grades when the dropout rate increases, and more elementary children, including first graders, receive transportation than do high schoolers.

The longest bus routes in the entire county are the routes by which four and five-year-old kindergarten children are transported to child development centers (see Principals' Monthly Bus Report, Defendants' Exhibit 63). The Pineville Child Development Center has one bus, No. 297, which travels over 79 miles a day on one round trip with four and five-year-old children. Another such trip is over 70 miles a day. The Davidson Child Development Center has five

busses which travel from 48 to 60 miles a day on one round trip with five-year-old children. The Bain Elementary School has a bus route, No. 115, which travels over 61 miles on one round trip each day, requiring two hours in the morning and two hours in the afternoon with elementary children. Routes to numerous elementary schools are very long in miles and time. The more than 10,000 children in grades one through six who have been riding school busses all these years and who now ride at an average travel time of an hour and a quarter each way are not shown to have had their education damaged by the experience.

Educationally it appears unreasonable to postpone desegregation of small children until later grades. The only concrete evidence of an educational nature in the whole hearing which rose above the level of opinion is the Stanford Achievement Tests which show that the performance gap, which is ordinarily noticeable in the first grade, has become several grades wide by the time the segregated black child reaches the sixth grade. The lasting effects of segregation are minimized if it is eliminated at an early age.

33. *Traffic problems.*—The county has over 160,000 passenger vehicles and nearly 30,000 trucks registered in it. It is estimated that the total number of automobile trips in the county daily other than truck trips is over 869,000. Traffic is heavy in most parts of the county. Since the so-called "cross-bussing" of the Finger plan or the minority plan will not contemplate pick up and discharge of pupils in the central business area, the busses added by the Finger plan or the minority Board plan will provide very little interference with normal flow of traffic. School busses are no wider than other busses (the law requires that this be so); they already use all the major streets and traffic arteries in the county and city every school morning of the year. There is no evidence to show that adding 138 school busses to the volume of existing traffic will provide any such impediment as should be measured against the constitutional rights of children. It would also appear that a school bus transporting 40 to 75 children should reduce traffic problems by cutting down on the number of automobiles that parents might otherwise be driving over the same roads.

34. The schools already operate on staggered schedules. Today, the opening and closing of schools and the class hours of school bus drivers are adjusted to serve the practical requirements of transportation. Plaintiffs' Exhibit 12 shows that the elementary schools already operate on a staggered opening and closing schedule. Some open at 8:00; some at 8:05; some at 8:10; some at 8:15; some at 8:25 and some at 8:30 and 8:45 in the morning, and the schools close for grades one and two at hours including 1:30; 1:35; 2:00; 2:15; 2:30; 2:45; 3:00; 3:05 and 3:10. The court finds that staggered opening and closing hours for elementary schools, and arrangement of class schedules of bus drivers for late arrival and early departure are facts of life which will not be eliminated by desegregation of the schools.

35. The defendants have plenty of money, plenty of know-how, plenty of busses on hand or available upon request, and plenty of capacity to implement the court ordered plan or the minority plan or any combination of the various plans. Their contentions to the contrary, and their five million dollar "estimates," when heard against the actual facts, border on fantasy! *

---

* "There was a table set out under a tree in front of the house, and the March Hare and the Hatter were having tea at it * * *. The table was a large one, but the three were all crowded together at one corner of it. 'No room! No room!' they cried out when they saw Alice coming. 'There's *plenty* of room!' said Alice indignantly and she sat down in a large arm-chair at one end of the table." (Lewis Carroll, *Alice's Adventures in Wonderland.*)

**B.** *Reasonableness of methods.—* "Reasonable" is variously defined in more than 1,000 words in Webster's Unabridged Dictionary. In the context, the most appropriate definition seems to come from Black's Law Dictionary: "Reasonable. Just; proper. Ordinary or usual. *Fit and appropriate to the end in view.*" (Emphasis added.)

■ The end in view is the desegregation of the schools. The methods available include the following: (1) consolidation of schools (which began fifty years or more ago, and for which the school bus has been the "ordinary or usual," as well as the necessary tool; (2) assignment of pupils; (3) school bussing; (4) non-contiguous zoning (before *Brown*, no black child was allowed to attend the nearest school if it happened to be white); (5) restructuring of grades in schools; (6) rezoning; (7) pairing, clustering and grouping of schools; (8) use of satellite zones; (9) freedom of choice, with appropriate restrictions; and (10) closing of schools.

All of these methods have been approved as legal by the Fourth Circuit Court of Appeals and by other courts. They work; singly and in combination they can work to accomplish the reassignment of children to eliminate segregation. If they are legal, and if they accomplish the end in view, and if they have been in use for half a century, they certainly qualify as "reasonable" methods. They are "appropriate to the end in view"; they desegregate the schools in a practical way.

**C.** *The various plans.—*

■ 1. *The ¾ Majority Board Plan.* —The original Board plan was rejected by this court and by the Circuit Court. The School Board has not obeyed the order of the Circuit Court of Appeals to file a new plan, and has not drafted nor attempted to draft another plan. The Board majority have not explored other methods of desegregation as directed by the Circuit Court (pairing, clustering, grouping, non-contiguous zoning, re-arranging grade structures), except to discuss these matters among themselves and to offer lengthy testimony rationalizing the non-use of alternative methods. Although parts of the disapproved Board plan could be used in a current plan, the Board plan as originally proposed is still inadequate because it leaves half the black elementary students still attending black schools. The court does not find it to be reasonable.

■ 2. *The HEW plan.—*This plan proposes to adopt the basic zoning program of parts of the Board majority plan, and then to re-zone some of the black schools with some white schools, mostly in low and middle income areas, and by clustering, pairing, grouping and transportation, to produce a substantial desegregation of most of the black schools. The faults of the plan are obvious. It leaves two schools (Double Oaks and Oaklawn) completely black; it leaves more than a score of other schools completely white; it would withdraw from numerous white schools the black students who were transported to those schools during the 1969–70 school year. The clusters proposed by HEW would for the most part continue to be thought of as "black" in this county because the school populations of most of the clusters would vary from 50% to 57% black and the lowest black percentage in any cluster is 36%. Recommended HEW faculty assignments to these clusters of schools contemplated faculties which in the main would be less than half white, and this would be another retrogression from the arrangements already made by the School Board for the fall term! Contrary to the orders of the district court and the Circuit Court, the HEW people limited their zoning to contiguous areas.

All witnesses except the HEW representatives themselves joined in hearty criticism of the HEW plan because of its ignorance of local problems, because of its threat of resegregation, and because it tends to concentrate upon the black and low- or middle-income community a race problem that is county wide.

In other days and other places the HEW plan would have looked good; and in those districts where black students are in the majority, much of such a plan could well be reasonable today. However, "reasonableness" has to be measured in the context; and in this context the HEW plan does not pass muster. It also on the facts of this case would fail to comply with the Constitution.

3. *The court order of February 5, 1970, including the Finger Plan.*—This order directs the desegregation of the schools. It offers the Finger plan as one way to do it, and encourages the Board to use its own resources to develop something better. As to the Finger elementary plan itself, the court, after eight days of further evidence and extensive further study, still finds it to be a reasonable method or collection of methods for solving the problem. The plan was designed by a qualified educator. It was drafted with technical assistance of the school staff. It does the complete job. It has a clear pupil assignment plan. It preserves a sound grade structure; it is adaptable to ungraded experimentation; it can be implemented piecemeal, in sections or by clusters of schools if necessary; it embraces local knowledge; it can be implemented immediately. It uses all reasonable methods of desegregation. It takes proper advantage of traffic movement and school capacity. It passes all tests of reasonableness.

4. *The ⅘ Minority Board Plan.*— This plan was presented intelligently and clearly by Dr. Carlton Watkins, its chief drafter, one of a ⅘ minority of the Board. It was spared any aggressive attack by Board witnesses or counsel. It is home grown. It was conceived and drafted by four members of the local Board. It uses all the techniques of the Finger plan. It desegregates all the schools. Like the Finger plan, it involves all communities of the county. It appears to the court that it can be implemented with somewhat shorter travel distances for school busses, though perhaps a few more children might have to ride school busses than under the Finger plan. Its assignments are made with an eye toward the dynamics of community growth and shrinkage. It is spontaneous in origin and shows a willingness on the part of some of the Board to experiment. Its cost of implementation is roughly on a par with that of the Finger plan. Like the Finger plan, it can be implemented one part at a time and it does not create probabilities of resegregation of black schools. The principal fault of the minority plan is its present lack of a system of pupil assignment. Board witnesses were not willing to admit it outright, but the court has the very definite impression that they could draft a pupil assignment plan and put the minority plan into effect this fall if so directed by the Board.

5. *An earlier draft of the Finger plan.*—This draft, illustrated by Plaintiffs' Exhibit 10, is the first comprehensive recommendation of Dr. Finger to the court and to the school staff. It would require less transportation than any other plan before the court, and for shorter distances. It would have to be implemented all at once, and it does not involve all of the county in its scope. From the standpoint of economics it may be the cheapest plan available. From the standpoint of avoidance of tendencies toward resegregation and from the standpoint of total community-involvement in the total community plan it is not on a par with the minority plan nor the final Finger plan. It is, however, like the minority plan and the final Finger plan ordered by the court, a "reasonable" plan.

### VI.

### A RESERVATION CONCERNING REASONABLENESS VERSUS CONSTITUTIONAL RIGHTS

██ Reasonable remedies should always be sought. Practical rather than

burdensome methods are properly required. On facts reported above, the methods required by this order are reasonable. However, if a constitutional right has been denied, this court believes that it is the constitutional right that should prevail against the cry of "unreasonableness." If a home has been illegally searched and evidence seized, the evidence is suppressed. If a defendant in a drunk driving case "takes the Fifth" and puts the state to its proof, the state has to prove its case without any testimony from him. The unreasonableness of putting the state to some expense can not be weighed against nor prevail over the privilege against self-incrimination or the right of people to be secure in their homes. If, as this court and the Circuit Court have held, the rights of children are being denied, the cost and inconvenience of restoring those rights is no reason under the Constitution for continuing to deny them. Griffin v. County School Board of Prince Edward County, *supra*.

### ORDER

1. Pursuant to the June 29, 1970 mandate of the Supreme Court of the United States, this court's order of February 5, 1970 will remain in effect pending these proceedings and except as modified herein or by later order of this court or a higher court.

2. The action of the Board in making faculty assignments in accordance with the order of February 5, 1970 is approved.

3. The action of the Board in making pupil assignments and other arrangements to operate the senior high schools in accordance with this court's order of February 5, 1970 is approved.

4. The action of the Board in making pupil assignments and other arrangements to operate the junior high schools in accordance with this court's order of February 5, 1970 is approved.

5. Numbered paragraphs 10 and 11 of the February 5, 1970 order of this court are amended by inserting the words "cumulative" and "substantially" at the appropriate points in each paragraph so that the two paragraphs will read as follows:

"10. That 'freedom of choice' or 'freedom of transfer' may not be allowed by the Board if the cumulative effect of any given transfer or group of transfers is to increase substantially the degree of segregation in the school from which the transfer is requested or in the school to which the transfer is desired.

"11. That the Board retain its statutory power and duty to make assignments of pupils for administrative reasons, with or without requests from parents. Administrative transfers shall not be made if the cumulative result of such transfers is to restore or substantially increase the degree of segregation in either the transferor or the transferee school."

6. As to the elementary schools:

(a) The order entered by this court on February 5, 1970 having been subjected to three weeks of review under the reasonableness test is expressly found to be reasonable, and the School Board are directed to put the court ordered plan of desegregation into effect at the opening of school in the fall of 1970, *unless* they avail themselves of some of the options indicated herein.

(b) The plan for elementary school desegregation proposed by a ⅘ minority of the School Board (the Watkins plan) has been examined and is found to be reasonable, as far as it goes. It is, however, incomplete because it contains no plan for pupil assignment. The School Board are authorized to prepare an appropriate pupil assignment plan and use the minority plan for elementary school desegregation instead of the comparable portions of the plan previously ordered by the court, if they so elect.

(c) The School Board, if they so elect, may use portions of the minority plan and portions of the court ordered plan, bearing in mind that the most important single element in the order of this court on February 5, 1970 is paragraph 16, reading as follows:

"16. The duty imposed by the law and by this order is the desegregation of schools and the maintenance of that condition. The plans discussed in this order, whether prepared by Board and staff or by outside consultants, such as computer expert, Mr. John W. Weil, or Dr. John A. Finger, Jr., are illustrations of means or partial means to that end. The defendants are encouraged to use their full 'know-how' and resources to attain the results above described, and thus to achieve the constitutional end by any means at their disposal. The test is not the method or plan, but the results."

(d) The Board are free to incorporate into any plan they may make whatever portions of the work of the Department of Health, Education and Welfare staff, or such parts of the original partial Finger plan (Plaintiffs' Exhibit 10), which are consistent with their duty to carry out the order to desegregate the schools.

(e) If the Board elect to carry out the Finger plan, they are authorized, if they find it advisable, to close Double Oaks school and reassign its pupils in accordance with the general purposes of the February 5, 1970 order.

(f) The Board are directed to file a written report with this court on or before noon on Friday, August 7, 1970, indicating what plan or combination of plans they have voted to use.

(g) The Board are again reminded, as they were reminded during the July 15, 1970 hearings, that since the 29th day of June, 1970, they have been and still are subject to the order of the Supreme Court, which reinstated this court's February 5, 1970 order pending these proceedings, and that this court will be under some duty to measure the Board's performance against what they could have done starting on June 29, 1970.

7. The following portion of this order is taken in modified form from the recommendations in the proposed plan of the Department of Health, Education and Welfare. It has been included in part in orders of district courts to various school systems, such as the school system in Dorchester County, South Carolina. It is included in this order not with any idea of impairing or affecting any party's right of appeal, but with the thought that this community has a difficult job of implementing a major desegregation program and that just as in the case of Greenville, South Carolina, whose schools were desegregated before any final word came from the Supreme Court, it will take leadership to do the job. Some of these suggestions of the Department of Health, Education and Welfare are therefore incorporated in this order as follows, for such aid as they may be in working through the difficult administrative and community problems which must be overcome:

## SUGGESTIONS FOR PLAN IMPLEMENTATION

Successful implementation of desegregation plans largely depends upon local leadership and good faith in complying with mandates of the Courts and the laws upon which the Courts act. The following suggestions are offered to assist local officials in planning for implementation of desegregational orders.

*Community.*

1. The Superintendent and Board of Education should frankly and fully inform all citizens of the community about the legal requirements for school desegregation and their plans for complying with these legal requirements.

2. The Board of Education should issue a public statement clearly

setting forth its intention to abide by the law and comply with orders of the Court in an effective and educationally responsible manner.

3. School officials should seek and encourage support and understanding of the press and community organizations representing both races.

4. The Board of Education, or some other appropriate governmental unit, should establish a bi-racial advisory committee to advise the Board of Education and its staff throughout the implementation of the desegregation plan. Such committee should seek to open up community understanding and communication, to assist the Board in interpreting legal and educational requirements to the public.

5. The Superintendent should actively seek greater involvement of parents of both races through school meetings, newsletters, an active and bi-racial P.T.A., class meetings, parent conferences, and through home visits by school personnel.

6. The Superintendent and Board of Education should regularly report to the community on progress in implementing the desegregation plan.

*School Personnel*

1. The Superintendent should provide all personnel copies of the desegregation plan and arrange for meetings where the personnel will have an opportunity to hear it explained.

2. The Board of Education should issue a policy statement setting forth in clear terms the procedures it will follow in reassignment of the personnel.

3. Assignments of staff for the school year should be made as quickly as possible with appropriate followings by school principals to assure both welcome and support for personnel new to each school: Invitations to visit school before the new school year begins should be offered.

4. The Superintendent should see that a special orientation program is planned and carried out for both the professional and non-professional staffs (including bus drivers, cafeteria workers, secretaries and custodians) preparatory to the new school year. He should make every effort to familiarize new and reassigned staff with facilities, services, and building policies, and prepare them to carry out their important role in a constructive manner. The Superintendent should direct each principal to see that each teacher new to a school is assigned for help and guidance to a teacher previously assigned to that school. Such teachers should have an opportunity to meet before the school year actually begins.

5. The Superintendent should arrange an in-service training program during the school year to assist personnel in resolving difficulties and improving instruction throughout the implementation period. Help in doing this is available from the St. Augustine College in Raleigh, North Carolina.

8. The Clerk is directed to serve copies of this order on the members of the School Board individually, and upon all other parties by sending copies by certified mail to their counsel of record.

9. Subject to further orders from higher courts, jurisdiction is retained, and the attention of the parties is called to pages 27 and 28 of the order of the Fourth Circuit Court of Appeals respecting the duties of the court and the parties with regard to any desired modification of the plan or of this order.

**§ 8. Intermarriage of whites and negroes prohibited.—All marriages** between a white person and a negro, or between a white person and a person of negro descent to the third generation, inclusive, are hereby forever prohibited. (Convention 1875.)

## ARTICLE IX

### EDUCATION

**§ 1. Education shall be encouraged.**—Religion, morality, and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged. (Const. 1868.)

**§ 2. General Assembly shall provide for schools; separation of the races.**—The General Assembly, at its first session under this Constitution, shall provide by taxation and otherwise for a general and uniform system of public schools, wherein tuition shall be free of charge to all children of the State between the ages of six and twenty-one years. And the children of the white race and the children of the colored race shall be taught in separate public schools: but there shall be no discrimination in favor of, or to the prejudice of, either race. (Const. 1868; Convention 1875.)

## GENERAL STATUTES OF NORTH CAROLINA

**§ 14-181. Miscegenation.**—All marriages between a white person and a negro, or between a white person and a person of negro descent to the third generation inclusive, are forever prohibited, and shall be void. Any person violating this section shall be guilty of an infamous crime, and shall be punished by imprisonment in the county jail or State's prison for not less than four months nor more than ten years, and may also be fined, in the discretion of the court. (Const., art. 14, s. 8; 1834, c. 24; 1838-9, c. 24; R. C., c. 68, s. 7; Code, s. 1084; Rev., s. 3369; C. S., s. 4340.)

**§ 14-182. Issuing license for marriage between white person and negro; performing marriage ceremony.** — If any register of deeds shall knowingly issue any license for marriage between any person of color and a white person; or if any clergyman, minister of the gospel or justice of the peace shall knowingly marry any such person of color to a white person, the person so offending shall be guilty of a misdemeanor. (1830, c. 4, s. 2; R. C., c. 34, s. 80; Code, s. 1085; Rev., s. 3370; C. S., s. 4341.)

**§ 51-3. Want of capacity; void and voidable marriages.**—All marriages between a white person and a negro or between a white person and person of negro descent to the third generation, inclusive, or between a Cherokee Indian of Robeson County and a negro, or between a Cherokee Indian of Robeson County and a person of negro descent to the third generation, inclusive, or between any two persons nearer of kin than first cousins, or between a male person under sixteen years of age and any female, or between a female person under sixteen years of age and any male, or between persons either of whom has a husband or wife living at the time of such marriage, or between persons either of whom is at the time physically impotent, or is incapable of contracting from want of will or understanding, shall be void: Provided, double first cousins may not marry; and provided further, that no marriage followed by cohabitation and the birth of issue shall be declared void after the death of either of the parties for any of the causes stated in this section, except for that one of the parties was a white person and the other a negro or of negro descent to the third generation, inclusive, and for bigamy; provided further, that no marriage by persons either of whom may be

[A2767]

under sixteen years of age, and otherwise competent to marry, shall be declared void when the girl shall be pregnant, or when a child shall have been born to the parties unless such child at the time of the action to annul shall be dead. A marriage contracted under a representation and belief that the female partner to the marriage is pregnant, followed by the separation of the parties within forty-five (45) days of the marriage which separation has been continuous for a period of one year shall be voidable: Provided, that no child shall have been born to the parties within ten (10) lunar months of the date of separation. (R. C., c. 68, ss. 7, 8, 9; 1871-2, c. 193, s. 2; Code, s. 1810; 1887, c. 245; Rev., s. 2083; 1911, c. 215, s. 2; 1913, c. 123; 1917, c. 135; C. S., 2495; 1947, c. 383, s. 3; 1949, c. 1022; 1953, c. 1105; 1961, c. 367.)

§ 51-16. Form of license.—License shall be in the following or some equivalent form:

To any ordained minister of any religious denomination, minister authorized by his church, or to any justice of the peace for........county: A. B. having applied to me for a license for the marriage of C. D. (the name of the man to be written in full of (here state his residence), aged ......years (race, as the case may be), the son of (here state the father and mother, if known; state whether they are living or dead, and their residence, if known; if any of these facts are not known, so state), and E. F. (write the name of the woman in full) of (here state her residence), aged......years (race, as the case may be), the daughter of (here state names and residences of the parents, if known, as is required above with respect to the man). (If either of the parties is under eighteen years of age, the license shall here contain the following:) And the written consent of G. H., father (or mother, etc., as the case may be) to the proposed marriage having been filed with me, and there being no legal impediment to such marriage known to me, you are hereby authorized, at any time within sixty days from the date hereof, to celebrate the proposed marriage at any place within the said county. You are required, within sixty days after you shall have celebrated such marriage, to return this license to me at my office with your signature subscribed in the certificate under this license, and with the blanks therein filled according to the facts, under penalty of forfeiting two hundred dollars to the use of any person who shall sue for the same.

Issued this .... day of ......, 19..    L. M.,

. Register of Deeds of......County

Every register of deeds shall designate in every marriage license issued the race of the persons proposing to marry by inserting in the blank after the word "race" the words "white," "colored" or "indian," as the case may be. The certificate shall be filled up, and signed by the minister or officer celebrating the marriage, and also he signed by one or more witnesses present at the marriage, who shall add to their names their place of residence, as follows:

I. N. O., an ordained or authorized minister of (here state to what religious denomination, or justice of the peace, as the case may be), united in matrimony (here name the parties), the parties licensed above, on the ...... day of ..........., 19....., at the house of P. R., in (here name the town, if any, the township and county), according to law.

Witness present at the marriage:    .....N. O.

S. T., of (here give residence). (Rev., 2089; Code, s. 1815; 1899, c. 541, ss. 1, 2; 1871-2, c. 193, s. 6; 1909, c. 704, s. 3; 1917, c. 38; C. S. 2502.)

Local Modification.—Bladen: 1941, c. 95.

§ 58-225. Maintenance of separate branches, when operated for benefit of both races.—All burial associations now operating in the state of North Carolina and all burial associations hereafter organized and operated in the state of North Carolina, for the benefit of both races, shall maintain and operate two separate branches, and provisions of article 24 shall apply to each branch as a separate association, except as hereinafter provided. (1941, c. 130, s. 3.)

§ 58-267. Meetings of governing body; principal office; separation of races.—Any such society or order incorporated and organized under the laws of this State may provide for the meeting of its supreme legislative or governing body in any other state, province, or territory wherein such society has subordinate lodges, and all business transacted at such meetings is as valid in all respects as if the meetings were held in this State; but the principal business office of such society shall always be kept in this State. No fraternal order or society or beneficiary association shall be authorized to do business in this State under the provisions of this article, whether incorporated under the laws of this or any other state, province, or territory, which associates with, or seeks in this State to associate with, as members of the same lodge, fraternity, society, association, the white and colored races with the objects and purposes provided in this article. (1899, c. 54, s. 91; Rev., s. 4797; 1913, c. 46; C. S., s. 6494.)

§ 60-94. Separate accommodations for different races.—All railroad and steamboat companies engaged as common carriers in the transportation of passengers for hire, other than street railways, shall provide separate but equal accommodations for the white and colored races at passenger stations or waiting-rooms, and also on all trains and steamboats carrying passengers. Such accommodations may be furnished by railroad companies either by separate passenger cars or by compartments in passenger cars, which shall be provided by the railroads under the supervision and direction of the utilities commission: Provided, that this shall not apply to relief trains in cases

[A2768]

of accident, to Pullman or sleeping cars, or through express trains that do not stop at all stations and are not used ordinarily for traveling from station to station, to negro servants in attendance on their employers, to officers or guards transporting prisoners, nor to prisoners so transported. (Rev., s. 2619; 1899, c. 384; 1901, c. 213; 1933, c. 134, s. 8; 1941, c. 97, s. 5; C. S. 3494.)

**§ 60-95. Certain carriers may be exempted from requirement.**—The utilities commission is hereby authorized to exempt from the provisions of § 60-94 steamboats, branch lines and narrow-gauge railroads and mixed trains carrying both freight and passengers, if in its judgment the enforcement of the same be unnecessary to secure the comfort of passengers by reason of the light volume of passenger traffic, or the small number of colored passenger travelers on such steamboats, narrow-guage railroads, branch lines or mixed trains. (Rev., s. 2620; 1899, c. 384, s. 2; 1901, c. 213; 1933, c. 134, s. 8; 1941, c. 97, s. 5; C. S. 3495.)

**§ 60-96. Use of same coach in emergencies.**—When any coach or compartment car for either race shall be completely filled at a station where no extra coach or car can be had, and the increased number of passengers could not be foreseen, the conductor in charge of such train may assign and set apart a portion of a car or compartment assigned for passengers of one race to passengers of the other race. (Rev., s. 2621, 1899, c. 384, s. 3; C. S. 3496.)

**§ 60-97. Penalty for failing to provide separate coaches.**—Any railroad or steamboat company failing to comply in good faith with the provisions of §§ 60-94 to 60-96 shall be liable to a penalty of one hundred dollars per day, to be recovered in an action brought against such company by any passenger on any train or boat of any railroad or steamboat company which is required by this

**§ 60-98**      CH. 60. RAILROADS,

chapter to furnish separate accommodations to the races, who has been furnished accommodations on such railroad train or steamboat only in a car or compartment with a person of a different race in violation of law. (Rev., s. 2622; 1899, c. 384, s. 5; C. S. 3497.)

**§ 60-98. Exceptions to requirement of separate coaches and toilets.**—As to trains consisting of not more than one passenger car unit, operated principally for the accommodation of local travel, although operated both intrastate and interstate and irrespective of the motive power used, the utilities commission is authorized to make such rules and regulations for the separation of the races and with regard to toilet facilities as in its best judgment may be feasible and reasonable in the circumstances, and the rules and regulations established pursuant to this authority shall be exceptions to the provisions of §§ 60-94 and 60-107. (1935, c. 270; 1941, c. 97, s. 5.)

**§ 60-135. Separate accommodations for different races; failure to provide misdemeanor.**—All street interurban and suburban railway companies, engaged as common carriers in the transportation of passengers for hire in the state of North Carolina, shall provide and set apart so much of the front portion of each car operated by them as shall be necessary, for occupation by the white passengers therein, and shall likewise provide and set apart so much of the rear part of such car as shall be necessary, for occupation by the colored passengers therein, and shall require as far as practicable the white and colored passengers to occupy the respective parts of such car so set apart for each of them. The provisions of this section shall not apply to nurses or attendants of children or of the sick or infirm of a different race, while in attendance upon such children or such sick or infirm persons. Any officer, agent or other employee of any street railway company who shall willfully violate the provisions of this section shall be guilty of a misdemeanor, and upon conviction shall be fined or imprisoned in the discretion of the court. (1907, c. 850, ss. 1, 5, 7; 1909, c. 851; C. S. 3536.)

**§ 62-44. To provide for separate waiting rooms for races.**—The commission is empowered and directed to require the establishment of separate waiting rooms at all stations for the white and colored races. (Rev., s. 1097; 1899, c. 64, s. 2, subsec. 14; 1933, c. 134, s. 8; 1941, c. 97; C. S. 1043.)

**§ 62-109. Regulatory powers of commission; separation of races.**—The commission is hereby vested with power and authority to supervise and regulate every motor vehicle carrier under this article; to make or approve the rates, fares, charges, classifications, rules and regulations for service and safety of operation and the checking of baggage of each such motor vehicle carrier; to supervise the operation of union passenger stations in any manner necessary to promote harmony among the operators and efficiency of service to the traveling public; to fix and prescribe the speed limit, which may be less but shall not be greater than that prescribed by law; to regulate the accounts and to require the filing of annual and other reports and of other data by such motor vehicle carriers; to require the increase of equipment capacity to meet public convenience and necessity; and to supervise and regulate motor vehicle carriers in all other matters affecting the relationship between such carriers and the traveling and shipping public. The commission shall have power and authority, by general order or otherwise, to prescribe rules and regulations applicable to any and all motor vehicle carriers, and the said commission is authorized, directed and empowered, whenever the public convenience and necessity may require, to increase, or decrease, or suspend temporarily the service upon any route for which a franchise certificate has been issued; and is hereby authorized, empowered, and directed to see that such rules and regulations and all, and singularly, the provisions of this article are enforced. The commission shall require any motor vehicle carrier operating on a franchise granted by the utilities commission and coming within the provisions of this article, if engaged in the transportation of both white and colored passengers for hire, to provide separate but equal accommodations for the white and colored races at passenger stations or waiting rooms where the carrier receives passengers of both races and/or on all busses or motor vehicles operating on a route or routes over which such carrier transports passengers of both races. Such accommodations may be furnished either by separate motor vehicles or by equal accommodations in motor vehicles. Provided that any requirement as to separate accommodation for the races shall not apply to specially chartered

motor vehicles or to negro servants and attendants on their employers, or to officers or guards transporting prisoners; and provided that operators of motor vehicles or bus lines or taxicabs engaged in the transportation of passengers of one race only shall not be required to provide any accommodations for the other race, and provided that an operator shall not be required to furnish any accommodations to the other race over a line or route where he has undertaken and is engaged in the transportation of passengers of only one race, and provided, further, that nothing contained in this section shall be construed to declare operators of busses and/or taxicabs common carriers. (1925, c. 50, s. 4; 1927, c. 136, s. 7; 1929, c. 216, s. 1; 1933, c. 134, s. 8; 1941, c. 97.)

**§ 65-38. Racial restrictions as to use of cemeteries for burial of dead.**—In the event said property has been heretofore used exclusively for the burial of members of the negro race, then said cemetery or burial ground so established shall remain and be established as a burial ground for the negro race. In the event said property has been heretofore used exclusively for the burial of members of the white race, then said cemetery or burial ground so established shall remain and be established as a burial ground for the white race. (1947, c. 821, s. 2.)

**§ 71-1. Cherokee Indians of Robeson County; rights and privileges.**—The persons residing in Robeson, Richmond, and Sampson counties, who have heretofore been known as "Croatan Indians" of "Indians of Robeson County," together with their descendants, shall hereafter be known and designated as "Cherokee Indians of Robeson County," and by that name shall be entitled to all the rights and privileges heretofore or hereafter conferred, by any law or laws of the state of North Carolina, upon the indians heretofore known as the "Croatan Indians" or "Indians of Robeson County." In all laws enacted by the General Assembly of North Carolina relating to said indians subsequent to the enactment of said chapter fifty-one of the Laws of eighteen hundred and eighty-five, the words "Croatan Indians" and "Indians of Robeson County" are stricken out and the words "Cherokee Indians of Robeson County" inserted in lieu thereof. (Rev., s. 4168; 445, c. 51, s. 2; 1911, c. 215; P. L. 1911, c. 263; 1913, c. 123; C. S. 6257.)

**§ 71-2. Separate privileges in schools and institutions.**—Such Cherokee indians of Robeson county and the indians of Person county, defined in the chapter Education, § 115-66, shall be entitled to the following rights and privileges:

Separate schools with the educational privileges provided in the chapter Education.

Suitable accommodations in the state hospital for the insane at Raleigh, as provided in the chapter Hospitals for the Insane, in the article entitled Organization and Management.

3. The sheriffs, jailers, or other properties of Robeson and Person counties shall provide in the common jails of said counties, and in the homes for the aged and infirm thereof, separate cells, wards, or apartments for such indians in all cases where it shall be necessary under the laws of this state to commit any of said indians to such jails or county homes. (1911, c. 215, s. 6; 1913, c. 123; P. L. 1913, c. 22; C. S. 6258.)

**§ 90-212. What bodies to be furnished.**—All officers, agents or servants of the State of North Carolina, or of any county or town in said State, and all undertakers doing business within the State, having charge or control of a dead body required to be buried at public expense, or at the expense of any institution supported by State, county or town funds, shall be and hereby are required immediately to notify, and, upon the request of said Board or its authorized agent or agents, without fee or reward, deliver, at the end of a period not to exceed thirty-six hours after death, such body into the custody of the Board, and permit the Board or its agent or agents to take and remove all such bodies or otherwise dispose of them: Provided, that such body be not claimed within thirty-six hours after death to be disposed of without expense to the State, county or town, by any relative within the second degree of consanguinity, or by the husband or wife of such deceased person: Provided, further, that the thirty-six hour limit may be prolonged in cases within the jurisdiction of the coroner where retention for a longer time may be necessary: Provided, further, that the bodies of all such white prisoners dying while in Central Prison or road camps of Wake County, whether death results from natural causes or otherwise, shall be equally distributed among the white funeral homes in Raleigh, and the bodies of all such negro prisoners dying under similar conditions shall be equally distributed among the negro funeral homes in Raleigh; but only such funeral homes can qualify hereunder as at all times maintain a regular licensed embalmer: Provided, further, that nothing herein shall require the delivery of bodies of such prisoners to funeral directors of Wake County where the same are claimed by relatives or friends.

[A2770]

**Art. 6. Separate Toilets for Sexes and Races.**

§ 95-48. When separate toilets required; penalty.—All persons and corporations employing males and females in any manufacturing industry, or other business employing more than two males and females in towns and cities having a population of one thousand persons or more, and where such employees are required to do indoor work chiefly, shall provide and keep in a cleanly condition separate and distinct toilet rooms for such employees, said toilets to be lettered and marked in a distinct manner, so as to furnish separate facilities for (white) males, (white) females, (colored) males and (colored) females: Provided, that the provisions of this section shall not apply to cases where toilet arrangements or facilities are furnished by said employer off the premises occupied by him. (1913, c. 83, s. 1; C. S. 6559.)

§ 95-49. Location; intruding on toilets misdemeanor.—It shall be the duty of the persons or corporations mentioned under this article to locate their toilets for males and females, (white) and (colored) in separate parts of their buildings or grounds in buildings hereafter erected, and in those now erected all closets shall be separated by substantial walls of brick or timber, and any employee who shall wilfully intrude upon or use any toilet not intended for his or her sex or color shall be guilty of a misdemeanor and upon conviction shall be fined five dollars. (1913, c. 83, s. 4; C. S. 6560.)

§ 95-50. Punishment for violation of article.—If any person, firm, or corporation refuses to comply with the provisions of this article, he or it shall be guilty of a misdemeanor, and upon conviction shall be fined or imprisoned, or both, in the discretion of the court. (1913, c. 83, s. 2; 1919, c. 100, s. 12; C. S. 6561.)

§ 105-323. Making up the tax records.—(a) The list takers for their respective townships, or such other persons as the commissioners may designate, shall make out, on forms approved by the State Board of Assessment, tax records which may consist of a scroll designed primarily to show tax valuations and a tax book designed primarily to show the amount of taxes or may consist of one record designated to show both valuations and taxes. Such records for each township shall be divided into four parts:

(1) (White) individual taxpayers (including lists filed by corporate fiduciaries for white individual beneficiaries);

(2) (Colored) individual taxpayers (including lists filed by corporate fiduciaries for colored individual beneficiaries);

(3) (Indian) individual taxpayers (including lists filed by corporate fiduciaries for Indian individual beneficiaries); and

(4) Corporations, partnerships, business firms and unincorporated associations.

*Reports to the State Board of Assessment and Local Government Commission.*

§ 105-335. Report of valuation and taxes.—The clerk of the board of county commissioners, auditor, tax supervisor, tax clerk, county accountant or other officer performing such duties shall, at such time as the board may prescribe, return to the State Board of Assessment on forms prescribed by said Board an abstract of the real and personal property of the county, showing the number of acres of land and their value, the number of town lots and their value, the value of the several classes of livestock, the number of white and negro polls, separately, and specify every other subject of taxation and the amount of county tax payable on each subject and the amount payable on the whole. At the same time said clerk, auditor, supervisor or other officer shall return to the State Board of Assessment an abstract or list of the poll, county and school taxes payable in the county, setting forth separately the tax levied on each poll and on each hundred dollars' value of real and personal property for each purpose, and also the gross amount of every kind levied for county purposes, and such other and further information as the State Board of Assessment may require. (1939, c. 310, s. 1300; 1963, c. 784, s. 2.)

[A2771]

## SUBCHAPTER I. THE PUBLIC SCHOOL SYSTEM.

### Art. 1. Interpretations.

**§ 115-1. A general and uniform system of schools.**—A general and uniform system of public schools shall be provided throughout the state, wherein tuition shall be free of charge to all children of. the state between the ages of six and twenty-one years. The length of term of each school shall be as authorized by the provisions of the School Machinery Act; however, unless the term is suspended as provided by § 115-351 the term shall not be less than eight months or one hundred and sixty days.

Every man or woman twenty-one years of age or over who has not completed a standard high school course of study, or who desires to study the vocational subjects taught in such school, shall be given equal privileges with every other student in school. (1923, c. 136, s. 1; 1939, c. 358, s. 4; C. S. 5383.)

**§ 115-2. Separation of races.** — The children of the white race and the children of the colored race shall be taught in separate public schools, but there shall be no discrimination in favor of or to the prejudice of either race. All white children shall be taught in the public schools provided for the white race, and all colored children shall be taught in the public schools provided for the colored race; but no child with negro blood, or what is generally known as Croatan Indian blood, in his veins, shall attend a school for the white race, and no such child shall be considered a white child. The descendants of the Croatan Indians, now living in Robeson, Sampson, and Richmond counties, shall have separate schools for their children. (1923, c. 136, s. 1; C. S. 5381)

**§ 115-3. Schools provided for both races; taxes.** —When the school officials are providing schools for one race, it shall be a misdemeanor for the officials to fail to provide schools for the other races, and it shall be illegal to levy taxes on the property and polls of one race for schools in a district without levying it on all property and polls for all races within said district. (1923, c. 136, s. 1; C. S. 5385.)

**§ 115-66. Board shall provide schools for Indians in certain counties.**—It shall be the duty of the county board of education to provide separate schools for Indians as follows:

The persons residing in Robeson and Richmond counties, supposed to be the descendants of a friendly tribe once residing in the eastern portion of the state, known as Croatan Indians, and who have heretofore been known as "Croatan Indians," or "Indians of Robeson County," and their descendants, shall be known and designated as the "Cherokee Indians of Robeson County"; and the persons residing in Person county supposed to be descendants of a friendly tribe of Indians and "White's Lost Colony," once residing in the eastern portion of this state, and known as "Cubans," and their descendants, shall be known and designated as the "Indians of Person County."

The Indians mentioned above and their descendants shall have separate schools for their children, school committees of their own race and color, and shall be allowed to select teachers of their own choice, subject to the same rules and regulations as are applicable to all teachers in the general school law, and there shall be excluded from such separate schools all children of the negro race to the fourth generation. The County Superintendent in and for Robeson County shall keep in his office a record of schools for the Cherokee Indians of Robeson County, which said record shall disclose the operation of such schools, separate and apart from the record of the operation of schools for the other races. (1923, c. 136, s. 42; 1931, c. 141; C. S. 5445.)

## ARTICLE 35.

## *Education Expense Grants.*

**§ 115-274. Statement of legislative policy and purposes.**—The General Assembly of North Carolina recognizes and hereby affirms that knowledge, morality, and adherence to fundamental principles of individual freedom and responsibility are necessary to good government and the happiness of mankind; and further affirms that schools and the means of education ought forever to be encouraged. The value and importance of our public schools are known and acknowledged by our people. It is further recognized that our public schools are so intimately related to the customs and feelings of the people of each community that their effective operation is impossible except in conformity with community attitudes. Our people need to be assured that no child will be forced to attend a school with children of another race in order to get an education. It is the purpose of the State of North Carolina to make available, under the conditions and qualifications set out in this article, education expense grants for the private education of any child of any race residing in this State. In so doing, it is the hope of the General Assembly of North Carolina that all peoples within our State

[A2772]

shall respect deeply-felt convictions, and that out public school system shall be continually strengthened and improved, and sustained by the support of all our citizens. (1956, Ex. Sess., c. 3.)

Editor's Note. — For article on North Carolina school legislation, 1956, see 35 N.C.L. Rev. 1 (1956).

§ 115-275. Who may apply for State grants; when available; nonsectarian school defined.—Every child residing in this State for whom no public school is available, or who is assigned to a public school attended by a child of another race against the wishes of his parent or guardian or the person standing in loco parentis to such child, is entitled to apply for an education expense grant from State funds appropriated for that purpose. Such grants shall be available only for education in a private nonsectarian school, and in the case of a child assigned to a public school attended by a child of another race, shall, in addition, be available only when it is not reasonable and practicable to reassign such child to a public school not attended by a child of another race. For purposes of this article, a nonsectarian school is defined as a school whose operation is not controlled directly or indirectly by any church or sectarian body or by any

§ 115-278. When applications to be approved.—Application for an education expense grant shall be approved if the board of education to whom application is made finds that:

(1) The child for whom application is made resides within the administrative unit; and

(2) There is no public school available for such child, or such child is now assigned against the wishes of his parent or guardian or of the person standing in loco parentis to such child to a public school attended by a child of another race and it is not reasonable and practicable to reassign such child to a public school not attended by a child of another race; and

(3) Such child is enrolled in or has been accepted for enrollment in a private nonsectarian school, recognized and approved under article 32 of this chapter. (1956, Ex. Sess., c. 3.)

§ 115-323. President, executive committee, and other officials; election, terms, and salaries.—The board of directors shall organize by electing one of its number president and three an executive committee. The terms of office in each case shall be for two years. The board shall elect a superintendent, who shall be ex officio secretary of the board, and whose term of office shall be for three years; also a steward and a physician whose terms of office shall be for two years; and such officers, agents, and teachers as shall be deemed necessary.

The compensation for officers and agents and teachers, mentioned in this section, shall be fixed by the board, and shall not be increased nor reduced during their term of service. The board shall have power to erect any buildings necessary, make improvements, and in general do all matters and things which may be beneficial to the good government of the institution, and to this end may make bylaws for the government of the same. The board of directors may term the head teacher of the white department "principal," and the chief officer of the colored department "principal of the colored department." (1881, c. 211, s. 3; Code, § 2229; Rev., s. 4189; 1917, c. 35; ss. 1, 2; C. S., s. 5874; 1963, c. 448, s. 28 )

§ 115-325. Admission of pupils; how admission obtained.—The board of directors shall, on application receive in the institution for the purpose of education, in the main department, all white blind children, and in the department for colored all colored deaf-mutes and blind children, residents of this State, not of confirmed immoral character, nor imbecile, nor unsound in mind, nor incapacitated by physical infirmity for useful instruction, who are between the ages of seven and twenty-one years: Provided, that pupils may be admitted to said institution who are not within the age limits above set forth, in cases in which

[A2773]

the board of directors find that the admission of such pupils will be beneficial to them and in cases in which there is sufficient space available for their admission in said institution: Provided, further, that the board of directors is authorized to make expenditures, out of any scholarship funds or other funds already available or appropriated, of sums of money for the use of out of State facilities for any student who, because of peculiar conditions of race or disability, cannot be properly educated at the School in Raleigh. (1881, c. 211, s. 5; Code, s. 2231; Rev., s. 4191; 1917, c. 35, s. 1; C. S., s. 5876; 1947, c. 375; 1949, c. 507; 1953, c. 675, s. 14; 1963, c. 448, s. 28.)

## Article 41.

### State Schools for the Deaf.

§ 115-336. Incorporation, name and location.—There shall be maintained a school for the white deaf children of the State which shall be a corporation under the corporate name of the North Carolina School for the Deaf, to be located upon the grounds donated for that purpose near the town of Morganton. The North Carolina School for the Deaf shall be classed and defined as an educational institution: Provided that the board of directors and the superintendent of said institution are hereby authorized to change the name of said institution to some other name that will completely eliminate the word "deaf" from the name of said institution. (1891, c. 399, s. 1; Rev., s. 4202; 1915, c. 14; C. S., s. 5888; 1957, c. 1433; 1963, c. 448, s. 28.)

§ 115-345. Directors; selection, self-perpetuation, management of corporation.—M. F. Thornton, Reverend M. C. Ransom, J. W. Levy, J. C. Jeffreys, J. E. Shepard, N. A. Cheek, Alex Peace and Reverend G. C. Shaw are hereby named and appointed as members of the board of directors of said "The Central Orphanage of North Carolina." The Governor of North Carolina shall appoint five white citizens of Granville County as members of said board of directors, and the thirteen so named shall constitute the board of directors of said corporation. Said board of directors shall organize by the election of a president and secretary, shall make all necessary bylaws and regulations for the convenient and efficient management and control of the affairs of said corporation, including the method by which successors to the directors herein named shall be chosen. (1927, c. 162, s. 2; 1963, c. 448, s. 28; 1965, c. 617, s. 2.)

Editor's Note. — The 1965 amendment substituted "The Central Orphanage of North Carolina" for "The Colored Orphanage of North Carolina."

§ 115-346. Board of trustees; appropriations; treasurer; board of audit.—The five members of said board of directors so appointed by the Governor shall also serve as a board of trustees of said "The Central Orphanage of North Carolina." The said board of trustees so appointed shall serve for a term of four years and until their successors are chosen. All appropriations made by the General Assembly to the said "The Central Orphanage of North Carolina" shall be under the control of the board of trustees, and said appropriations shall be expended under their supervision and direction. The board of trustees shall select one of their members as a treasurer of the fund appropriated to the institution by the General Assembly and also not more than two persons to act as a board to audit the expenditure of such appropriation. The treasurer shall receive a salary of one hundred dollars per year for his services and members of the board of audit a salary not to exceed one hundred and fifty dollars per year. The treasurer shall give a bond payable to the State of North Carolina in a surety company in such sum as the board of trustees may require, the annual premium to be paid out of the funds of the said Orphanage. (1927, c. 162, s. 3; 1963, c. 448, s. 28; 1965, c. 617, s. 2.)

[A2774]

**Editor's Note.** — The 1965 amendment substituted "The Central Orphanage of North Carolina" for "The Colored Orphanage of North Carolina."

**§ 115-347. Training of orphans.**—The said corporation shall receive, train and care for such colored orphan children of the State of North Carolina as under the rules and regulations of said corporation may be deemed practical and expedient, and impart to them such mental, moral and industrial education as may fit them for usefulness in life. (1927, c. 162, s. 4; 1963, c. 448, s. 28.)

**§ 115-341. Pupils admitted; education.**—The board of directors shall, according to such reasonable regulations as it may prescribe, on application, receive into the school for the purposes of education all white deaf children resident of the State not of confirmed immoral character, nor imbecile or unsound in mind or incapacitated by physical infirmity for useful instruction, who are between the ages of six and twenty-one years: Provided, that the board of directors may audit students under the age of six years when, in its judgment, such admission will be for the best interest of the applicant and the facilities of the school permit such admission. Only those who are bona fide citizens and/or residents of North Carolina shall be eligible to and entitled to receive free tuition and maintenance. The board of directors may fix charges and prescribe rules whereby nonresident deaf children may be admitted, but in no event shall the admission of nonresidents in any way prevent the attendance of any eligible deaf child, resident of North Carolina. The board shall provide for the instruction of all pupils in the branches of study now prescribed by law for the public schools of the State and in such other branches as may be of special benefit to the deaf. As soon as practicable, the boys shall be instructed and trained in such mechanical pursuits as may be suited to them, and in practical agriculture and subjects relating thereto; and the girls shall be instructed in sewing, housekeeping, and

**§ 115-360. Principals allowed.**—In all schools with fewer than fifty teachers allowed under the provisions of this subchapter, the principals shall be included in the number of teachers allowed. In schools with fifty or more teachers, one whole time principal shall be allowed; that for each forty teachers in addition to the first fifty, one additional whole time principal, when and if actually employed, shall be allowed: Provided, that in the allocation of state funds for principals, the salary of white principals shall be determined by the number of white teachers employed in the white schools, and the salary of colored principals shall be determined by the number of colored teachers employed in the colored schools: Provided, further, that where the schools of a district are under the control of the same district committee, the district principal shall have general supervision of all the schools in the district: Provided, further, that where a white school and a colored school are both under the control of the same district committee, and where the principal of the white school is called upon by the district committee to perform certain duties in connection with the operation of the colored school such as aiding in the employment of teachers and in the general

... to promote the material welfare ... education of the industrial classes in the several pursuits and professions of life. (1907, c. 406, s. 3; C. S. 5807.)

**§ 116-29. Share in appropriations by congress.**—The appropriations made or which may hereafter be made by the congress for the benefit of

[A2775]

colleges of agricultural and mechanical arts shall be divided between the white and colored institutions in this state in the ratio of the white population to the colored, as ascertained by the preceding national census. (1907, c. 406, s. 1; C. S. 5808.)

**Part 3. Woman's College of the University of North Carolina.**

**§ 116-38. Operation of College for Women at Greensboro.** — The North Carolina College for Women shall from and after March 27, 1931, be conducted and operated as a part of the University of North Carolina. It shall be located at Greensboro, North Carolina, and shall be known as the Women's College of the University of North Carolina. (1931, c. 202, s. 3.)

**§ 116-39. Objects of institution.**—The objects of the Woman's College of the University of North Carolina shall be to teach young white women all branches of knowledge recognized as essential to a liberal education, such as will familiarize them with the world's best thought and achievement and prepare them for intelligent and useful citizenship; to make special provision for training in the science and art of teaching, school management, and school supervision; to provide women with such training in the arts, sciences, and industries as may be conducive to their self-support and community usefulness; to render to the people of the state such aid and encouragement as will tend to the dissemination of knowledge, the fostering of loyalty and patriotism, and the pro-

¶¶ ]

§ 116-40        CH. 116.  EDUCATIONAL I

motion of the general welfare. (1919, c. 199, s. 2; C. S. 5835.)

§ 116-40. Admission of students.—The board of trustees shall make rules and regulations for the admission of students, but shall not discriminate against any county in the number of students allowed it, in case all applicants cannot be accommodated. Each county shall have representation in proportion to its white school population, if it desires it; and, should any county fail to avail itself of its proportional number, the board of trustees may recognize applicants from counties which already have their proportionate representation. (Rev., s. 4251; 1891, c. 139, s. 4; C. S. 5836.)

### Art. 3.  East Carolina Teachers' College.

§ 116-56. Incorporation and corporate powers.—The trustees of the East Carolina Teachers' College, established by an act of the general assembly of North Carolina of one thousand nine hundred and seven, and located at Greenville, North Carolina, shall be and are hereby constituted a body corporate by and under the name and style of "The Board of Trustees of the East Carolina Teachers' College," and by that name may sue and be sued, make contracts, acquire real and personal property by gift, purchase, or devise, and exercise such other rights and privileges incident to corporations of like character as are necessary for the proper administration of said college. (1907, c. 820, ss. 11, 12, 16; 1911, c. 159, s. 1; Ex. Sess. 1921, c. 27, s. 1; C. S. 5863.)

§ 116-57. Object of college.—The college shall be maintained by the state for the purpose of giving to young white men and women such education and training as shall fit and qualify them to teach in the public schools of North Carolina. (1907, c. 820, s. 15; 1911, c. 159, s. 2; C. S. 5864.)

§ 116-58. Diplomas and certificates.—The board of trustees, upon the recommendation of the faculty, shall give those students in said college who have completed the prescribed course of study a diploma of graduation, and shall have the

### Art. 5.  Pembroke State College for Indians.

§ 116-79. Incorporation and corporate powers; location.—The Pembroke State College for Indians shall be and remain a state institution for educational purposes, in the county of Robeson, under the name and style aforesaid, and by that name may have perpetual succession, sue and be sued, contract and be contracted with; have and hold school property, including buildings, lands, and all appurtenances thereto, situated in the county of Robeson, at any place in that county to be selected by the trustees between Bear swamp and Lumber river; acquire by purchase, donation, or otherwise, real and personal property for the purpose of establishing and maintaining a school of high grade for teachers of the race of Cherokee Indians of Robeson county by North Carolina. (Rev., s. 4020; 1887, c. 400, ss. 1, 6; 1911, cc. 168, ss. 1, 2, 915, s. 4; 1913, c. 123, ss. 4, 6; 1941, c. 333, s. 1; C. S. 5843.)

### Art. 7.  Negro Agricultural and Technical College of North Carolina.

§ 116-92. Establishment and name.—A college of agricultural and mechanical arts is hereby established for the colored race to be located at some eligible site within this state. Such institution shall be denominated The Negro Agricultural and Technical College of North Carolina. (Rev., s. 4221; 1891, c. 549, ss. 1, 2; 1915, c. 207; C. S. 5826.)

§ 116-93. Object of college.—The leading object of the institution shall be to teach practical agriculture and the mechanic arts and such branches of learning as relate thereto, not excluding academical and classical instruction. (Rev., s. 4222; 1891, c. 549, s. 3; C. S. 5827.)

§ 116-94. Board of trustees; appointment; vacancies; president. — The management and control of the college and the care and preservation of all of its property shall be vested in a board of trustees, who shall be elected by the general assembly. The board of trustees shall consist of fifteen members, five of whom shall be elected at each regular session of the general assembly and shall hold office for six years. Any vacancy which, for any cause, may occur, shall be filled by the governor for the unexpired term. The board shall annually elect one of their number to be president of the board of trustees. (Rev., s. 4223; 1891, c. 549, s. 4; 1899, c. 389, s. 1; C. S. 5828.)

§ 116-95. Meetings of board; compensation; executive board.—The number and times of the meeting of the board of trustees shall be fixed by the board, and the trustees shall not receive any pay or per diem, but only their traveling ex-

pils to the college for the various congressional districts of this state as they may deem equitable and right, having due regard to the colored population thereof (Rev., s. 4226; 1891, c. 549, s. 5; C. S. 5831.)

§ 116-98. Power to receive property, and proportion of congressional donations.—The board of trustees is empowered to receive any donation of property which may be made to the college, and shall have power to invest or expend the same for the benefit of the college; and shall have power to accept on behalf of this college such proportion of the fund granted by the congress of the United States to the state of North Carolina for industrial and agricultural training as is apportioned to the colored race, in accordance with the act or acts of the congress in relation thereto. (Rev., s. 4227; 1891, c. 549, ss. 6, 12; C. S. 5832.)

### Art. 8.  North Carolina College for Negroes.

§ 116-99. Trustees of the North Carolina College for Negroes at Durham.—There shall be twelve (12) trustees for the North Carolina College for Negroes at Durham. Within thirty days from March 10, 1925, the Governor shall appoint seven (7) members of said board and within six months from March 10, 1925, the Governor shall appoint five (5) members of said board. The terms of office of such trustees shall be four years and until successors are appointed and qualified. At the time of making such appointments he shall designate the members of the present board who are to be succeeded by his appointees. All vacancies are to be filled by the Governor. The Governor shall transmit to the Senate at the next session of the General Assembly following his appointment the names of the persons appointed by him

LA2776]

for confirmation. The Governor shall have the power to remove any member of the board of trustees whenever in his opinion it is to the best interest of the state to remove such person, and the Governor shall not be required to give any reason for such removal. (1925, c. 306, ss. 9a, 13, 14.)

§ 116-100. Graduate courses for negroes; superintendent of Public Instruction as ex-officio member of boards of trustees.—The board of trustees of the North Carolina College for Negroes is hereby authorized and empowered to establish from time to time such graduate courses in the liberal arts field as the demand may warrant, and the funds of the said North Carolina College for Negroes justify. Such courses so established must be standard.

The board of trustees of the North Carolina College for Negroes is authorized and empowered to establish departments of law, pharmacy and library science at the above-named institution whenever there are applicants desirous of such courses. Said board of trustees of the North Carolina College for Negroes may add other professional courses from time to time as the need for the same is shown, and the funds of the state will justify.

The board of trustees of the Negro Agricultural and Technical College at Greensboro may add graduate and professional courses in agricultural and technical lines as the need for same is shown and the funds of the state will justify, and establish suitable departments therein.

In the event there are negroes resident in the state properly qualified who can certify that they have been duly admitted to any reputable graduate or professional college and said graduate or professional courses are not being offered at the North Carolina College for Negroes, then the board of trustees of the North Carolina College for Negroes when said certification has been presented to them by the president and faculty of the North Carolina College for Negroes, may pay tuition and other expenses for said student or students at such recognized college in such amount as may be deemed reasonably necessary to compensate said resident student for the additional expense of attending a graduate or professional school outside of North Carolina, and the budget commission may upon such presentation reimburse the North Carolina College for Negroes the money so advanced. It is further provided that the student applying for such admission must, furnish proof that he or she has been duly admitted to said recognized professional college. In the case of agricultural or technical subjects such students desiring graduate courses should apply to the Agricultural and Technical College at Greensboro, North Carolina. The general provisions covering students in the liberal arts field as stated in this section shall apply. In no event shall there be any duplication of courses in the two institutions.

Said boards of trustees are authorized, upon satisfactory completion of prescribed courses, to give appropriate degrees.

It is further stipulated that the superintendent of public instruction for North Carolina shall be a member ex officio of the boards of trustees of the North Carolina College for Negroes and Agricultural and Technical College at Greensboro, and shall advise with the boards of trustees of said

[A2777]

Colleges upon the courses to be offered, and the certification of students to other colleges. In case of needless duplication of graduate or professional courses in either college, the superintendent of public instruction shall be charged with the duty of reporting the same to the board of trustees of either institution, and the same shall be remedied. In case of failure to remedy the same, he shall report such failure to the budget bureau which will have the power and authority in its judgment to withhold any part of the appropriation from the institution so offending until said duplication is discontinued.

The board of trustees of the North Carolina College for Negroes and the trustees of the agricultural and Technical College, in the event that the budget of the institutions will not permit this section to be carried out on account of lack of funds, shall present the situation to the assistant director of the budget, the governor of North Carolina and the council of state; and they are hereby empowered to provide such funds as may be necessary to carry out the purposes of the same. (1939, c. 65.)

### Art. 9. Negro State Teachers Colleges.

§ 116-101. Power of state board of education to establish.—The state board of education is hereby empowered to establish normal schools at any place it may deem most suitable, either in connection with one of the colored schools of high grade in the state, or otherwise, for teaching and training young men and women of the colored race, from the age of fifteen to twenty-five years, for teachers in the common schools of the state for the colored race. A preparatory department may be established in connection with the colored normal schools. And such board shall have the power to remove or close any of the existing state normal schools for the colored race. (Rev., s. 4180; Code, ss. 2651, 2652; 1881, cc. 91, 141, s. 5; 1879, c. 54, ss. 1, 2; 1876-7, c. 234, s. 2; 1901, c. 565, s. 1; C. S. 5850.)

§ 116-102. State board of education to control and manage Negro State Teachers Colleges.—The state board of education shall have supervision, and shall prescribe rules and regulations for the control, management, and enlargement of each of the following normal schools: the Elizabeth City State Teachers College, Elizabeth City; Fayetteville State Teachers College, Fayetteville; Winston-Salem Teachers College, Winston-Salem.

The state board of education shall make all needful rules and regulations concerning the expenditure of funds, the selection of principals, teachers, and employees. (1921, c. 61, s. 8; 1925, c. 306, s. 9; 1925 (Pr.), c. 170; 1931, c. 270, s. 1; 1939, cc. 178, 253; C. S. 5775.)

§ 116-103. Trustees for Negro State Teachers Colleges.—The Governor shall appoint a board of nine trustees for each of the following institutions: The Elizabeth City State Teachers College, at Elizabeth City; The Fayetteville State Teachers College at Fayetteville; and the Winston-Salem Teachers College at Winston-Salem. Four trustees for each college shall be appointed by the Governor within thirty days after March 10, 1925; the other five members shall be appointed within six months after March 10, 1925. At the

§ 116-109. Admission of pupils; how admission. obtained.—The board of directors shall, on application, receive in the institution for the purpose of education, in the main department, all white deaf children, and in the department for the colored all colored deaf-mutes and blind children, residents of this state, not of confirmed immoral character, nor imbecile, nor unsound in mind, nor incapacitated by physical infirmity for useful instruction, who are between the ages of seven and twenty-one years: Provided, that application shall be made and applicants received at stated times, which shall be at the commencement of some scholastic year.

In case of deaf-mutes the following questions shall be answered:

Name?
Is the child white or colored?
When and where was he born?
Was he born deaf?
At what age did he lose his hearing?
By what disease or accident did he become deaf?
Is the deafness total or partial?
Have any attempts been made to remove the deafness?
Is there any ability to articulate or read on the lips?
Have any attempts been made to communicate instruction?
Is he laboring under any bodily infirmity?
Does he show any signs of mental imbecility or idiocy?
Has he had the smallpox or been vaccinated?
Has he had the scarlet fever?
Has he had the measles?
Has he had the mumps?
Has he had the whooping-cough?

486 ]

### Art. 11.  North Carolina School for the Deaf at Morganton.

§ 116-120. Incorporation and location.—There shall be maintained a school for the white deaf children of the state which shall be a corporation under the corporate name of The North Carolina School for the Deaf, to be located upon the grounds donated for that purpose near the town of Morganton. The North Carolina school for the deaf shall be classed and defined as an educational institution. (Rev., s. 4202; 1891, c. 309, s. 1; 1913, c. 14; C. S. 5888.)

§ 116-124. Pupils admitted; education. — The board of directors shall, according to such reasonable regulations as it may prescribe, on application, receive into the school for the purposes of education all white deaf children resident of the state not of confirmed immoral character, nor imbecile or unsound in mind or incapacitated by physical infirmity for useful instruction, who are between the ages of eight and twenty-three years: Provided, that the board of directors may admit students under the age of eight years when, in its judgment, such admission will be for the best interest of the applicant and the facilities of the school permit such admission. Only those who have been bona fide citizens of North Carolina for a period of two years shall be eligible to and entitled to receive free tuition and maintenance. The board of directors may fix charges and prescribe rules whereby nonresident deaf children may be admitted, but in no event shall the

### ARTICLE 13.

### *Colored Orphanage of North Carolina.*

§§ 116-138 to 116-142: Transferred to §§ 115-344 to 115-348 by Session Laws 1963, c. 448, s. 28.

### ARTICLE 13A.

### *Negro Training School for Feebleminded Children.*

§§ 116-142.1 to 116-142.10: Repealed by Session Laws 1963, c. 1184, s. 8.

§ 116-141. Training of orphans.—The said corporation shall receive, train and care for such colored orphan children of the State of North Carolina as under the rules and regulations of said corporation may be deemed practical and expedient,

### Art. 14.  General Provisions as to Tuition Fees in Certain State Institutions.

§ 116-143. State-supported institutions required to charge tuition fees.—The trustees of the University of North Carolina, including the University of North Carolina, the State College of Agriculture and Engineering and the Woman's College of the University of North Carolina, and the trustees of the East Carolina Teachers' College, the Western Carolina Teachers' College, the Appalachian State Teachers' College, the Negro Agricultural and Technical College, the Winston-Salem Teachers' College, the Fayetteville State Teachers' College, the Elizabeth City State Teach-

[A2778]

ers' College, the North Carolina College for Negroes and the Pembroke State College for Indians, be and they are hereby authorized and directed to fix the tuition fees for their several state supported institutions, each board of trustees acting separately for their respective institutions, in such amount or amounts as they may deem best, taking into consideration the nature of each department and institution and the cost of equipment and maintaining the same; and are further instructed to charge and collect from each student, at the beginning of each semester, tuition fees and an amount sufficient to pay room rent, servants' hire and other expenses for the term. Indigent cripples are exempt from the provisions of this article.

In the event that said students are unable to pay the cost of tuition, as the same may become due, in cash, the said several boards of trustees are hereby authorized and empowered, in their

discretion, to accept the obligation of the student or students together with, such collateral or security as they may deem necessary and proper, it being the purpose of this article that all students in state institutions of higher learning shall the required to pay tuition, and that free tuition be and the same is hereby abolished, except such students as are physically disabled, and are so certified to be by the vocational rehabilitation division of the state board for vocational education, who shall be entitled to free tuition in any of the institutions named in this article. (1933, c. 320, s. 1; 1939, cc. 178, 253.)

§ 116-144. **Higher fees from non-residents may be charged.**—The provisions of this article shall not be construed to prohibit the several boards of trustees from charging non-resident students tuition in excess of that charged resident students. (1933, c. 320, s. 3.)

§ 122-3. **Division of territory and patients between Raleigh, Morganton and Goldsboro institutions.**—The state hospital at Raleigh and the state hospital at Morganton shall be exclusively for the accommodation, maintenance, care and treatment of the white insane of the state, and the state hospital at Goldsboro shall be exclusively for the accommodation, maintenance, care and treatment of the colored insane, epileptics, feebleminded and inebriates of the state. The line heretofore agreed upon by the directors of the state hospital at Raleigh and the state hospital at Morganton shall be the line of division between the territories of said hospitals, and white insane persons settled in counties east of said line shall be admitted to the state hospital at Raleigh, and white insane persons settled in counties west of said line shall be admitted to the state hospital at Morganton; epileptics shall be admitted as now provided by law. White inebriates shall be admitted to the state hospital at Raleigh (1929, c. 265, s. 1; 1933, c. 342, s. 1; C. S. 6153(a).)

§ 122-5. **Cherokee Indians of Robeson county and Croatan Indians of other counties.**—All the insane and inebriate Cherokee Indians of Robeson county, and all the insane and inebriate Croatan Indians of the other counties of the state, shall be cared for in the hospital for the insane at Raleigh in wards separate and apart from the white patients in said hospital, and all such Cherokee Indians of Robeson county and Croatan Indians of the other counties of the state shall be cared for and receive the same treatment as other patients in said hospital receive. (1919, c. 211; C. S. 6154.)

§ 122-6. **Epileptics cared for at Raleigh.**—Whenever it becomes necessary for any white person of this state, afflicted with the disease known as epilepsy, to be confined or to receive hospital treatment, such person shall be accommodated, maintained, cared for, and treated at the state hospital at Raleigh. Such epileptics shall be committed by the clerks of the superior courts of the several counties to the state hospital at Raleigh in the manner now provided by law for the commitment of insane persons to the several hospitals for the insane; and when such persons shall be committed it shall be the duty of the superintendent of the state hospital at Raleigh, and he is required, to receive such persons and care for, maintain, and treat them at the hospital at Raleigh, if the superintendent

[A2779]

shall find such persons to be afflicted to such extent as properly to become a public charge: Provided, that any person so committed who is able

§ 127-6. **White and colored enrolled separately.**—The white and colored militia shall be separately enrolled, and shall never be compelled to serve in the same organization. No organization of colored troops shall be permitted where white troops are available, and while permitted to be organized, colored troops shall be under command of white officers. (1917, c. 200, s. 6; C. S. 6796.)

§ 130-125. **Approval of housing projects.** — No housing project proposed by a limited dividend housing corporation incorporated under this article shall be undertaken, and no building or other construction shall be placed under contract or started without the approval of the board. No housing project shall be approved by the board unless:

(a) It shall appear practicable to rent or sell the housing accommodations to be created at prices not exceeding those prescribed by the board. No such project shall be approved in contravention of any zoning or building ordinance in effect in the locality in which designated areas are located.

(b) There shall be submitted to the board a financial plan in such form and with such assurances as the board may prescribe to raise the actual cost of the lands and projected improvements by subscriptions to or the sale of the stock, income debentures and mortgage bonds of such corporation. Whenever reference is made in this article to cost of projects or of buildings and improvements in projects, such cost shall include charges for financing and supervision approved by the board and carrying charges during construction required in the project including interest on borrowed and, where approved by the board, on invested capital.

(c) There shall be such plans of site development and buildings as show conformity to reasonable standards of health, sanitation, safety and provisions for light and air, accompanied by proper specifications and estimates of cost. Such plans and specifications shall not in any case fall below the requirements of the health, sanitation, safety and housing laws of the state and shall meet superior requirements if prescribed by local laws and ordinances.

(d) The corporation agrees to accept a designee of the board of housing as a member of the board of directors of said corporation.

(e) If required by the board, the corporation shall deposit all monies received by it as proceeds of its mortgage bonds, notes, income debentures, or stock, with a trustee which shall be a banking corporation authorized to do business in the state of North Carolina and to perform trust functions, and such trustee shall receive such monies and make payment therefrom for the acquisition of land, the construction of improvements and other items entering into cost of land improvements upon presentation of draft, check or order signed by a proper officer of the corporation, and, if required by the board, countersigned by the said board or a person designated by it for said purpose. Any funds remaining in the custody of said trustee after the completion of said project and payment or arrangement in a manner satisfactory to the board for payment in full thereof shall be paid to the corporation. (1933, c. 384, s. 5.)

§ 131-124. **Medical training for negroes.**—The North Carolina Medical Care Commission shall make careful investigation of the methods for providing necessary medical training for negro students and shall report its findings to the next session of the General Assembly. In addition to the benefits provided by § 116-110, the North Carolina Medical Care Commission is hereby authorized to make loans to negro medical students from the fund provided in § 131-121, subject to such rules, regulations, and conditions as the Commission may prescribe. (1945, c. 1096.)

*Eastern Carolina Industrial Training School for Boys.*

§ 134-67. **Corporation created; name; powers.**—A corporation to be known and designated as the Eastern Carolina Industrial Training School for Boys is hereby created, and as such corporation and under said name it may sue and be sued, plead and be impleaded, hold, use, and sell and convey real estate, receive gifts and donations and appropriations, and do all other things necessary and requisite for the purposes of its organization as hereinafter specified. (1923, c. 254, s. 1; C. S., s. 7362(a).)

§ 134-68: Repealed by Session Laws 1943, c. 776, s. 15.

§ 134-69. **Establishment and operation of school; boys subject to committal; control; term of detention.**—The trustees are empowered to establish and operate a school for the training and moral and industrial development of the criminally delinquent white boys of the State; and when such school has been organized the trustees may, in their discretion, receive therein such delinquent and criminal boys under the age of twenty years as may be sent or committed thereto under any order or commitment by the judges of the superior courts, the judges of the juvenile courts, or the recorders, or other presiding officers of the city or criminal courts, and shall have the sole right and authority to keep, restrain, and control them during their minority, or until such time as they shall deem proper for their discharge, under proper and humane rules and regulations as may be adopted by the trustees. (1923, c. 254, s. 3; C. S., s. 7362(c); 1937, c. 116.)

*Morrison Training School.*

§ 134-79. **Creation of corporation; name; powers.**—A corporation, to be known and designated "The Morrison Training School," hereby created, and as such corporation it is authorized and empowered to accept and use donations and appropriations, hold real estate by purchase or gift, and do all other things necessary and requisite to be done for the care, discipline and training of negro boys which may be received by said corporation. (1921, c. 190, s. 1; C. S., s. 5912(a); 1937, c. 146.)

§ 134-82. **Delinquents committed to institution; cost; age limit.**—Delinquent negro boys, under the age of sixteen years, may be committed to the institution by any juvenile, State, or other court having jurisdiction over such boy, but no boy shall be sent to the institution until the committing agency has received notice from the superintendent that such person can be received. The cost of sending inmates shall be paid by the county or municipality sending the same, as the case may be. In special cases where the public good would seem to be subserved thereby the board shall have the right, upon the request of any court of proper jurisdiction, to receive an inmate above the age of sixteen, but this shall be a matter wholly within the discretion of the board. When any commitment to the institution is made, it shall not be for any specified time, but may continue or terminate at the discretion of the board, not to exceed the age of majority of the inmate. (1921, c. 190, s. 4; C. S., s. 5912(d).)

[A2780]

*State Training School for Negro Girls.*

§ 134-84.1. Creation and name.—An institution, to be known and designated as State Training School for Negro Girls, is hereby created, and such institution is authorized and empowered to accept and use donations and appropriations and do all other things necessary and requisite to be done in furtherance of the purpose of its organization and existence as hereinafter set forth. (1943, c. 381, s. 1.)

§ 134-84.4. Operation of institution before permanent quarters established. —In order to provide for the operation of the said institution prior to the time that permanent quarters can be established, the board of directors, with the approval of the Governor and Council of State, is authorized and empowered to enter into an agreement with any other State institution or agency for the temporary uses of any State-owned property which such other State institution or agency may be able and willing to divert for the time being from its original purpose; and any other State institution or agency, which may be in possession of real estate suitable for the purpose of the State Training School for Negro Girls and which is not occupied or needed by said institution or agency, is hereby authorized to turn such real estate over to the directors of the State Training School for Negro Girls upon such terms as may be mutually agreed upon. (1943, c. 381, s. 4.)

§ 134-84.7. Committal and delivery of girls to institution; no inmate detained after becoming of age.—Any Negro girl under the age of sixteen years, who may come or be brought before any juvenile court of the State or other court of competent jurisdiction, and may be found by such court to be in need of institutional training, may be committed by such court to the institution for an indefinite period: Provided, that such person is not insane or mentally or physically incapable of being substantially benefited by the discipline of the institution: Provided, further, that before committing such person to the institution, the court shall ascertain whether the institution is in a position to care for such person; and that it shall be at all times within the discretion of the board of directors as to whether the board will receive any person into the institution. No commitment shall be for any definite term, but any person so committed may be conditionally released or discharged by the board of directors at any time after commitment, but in no case shall any inmate be detained in the institution for a period longer than such time at which she may attain the age of twenty-one years. It shall be the duty of the county authorities of the county from which any girl is sent to the institution or the city authorities, if any is ordered to be sent to the institution by any city court, to see that such girl is safely and duly delivered to the institution, and to pay all the expenses incident to her conveyance and delivery to the institution. (1943, c. 381,

§ 134-84.9. Contract to care for certain girls within federal jurisdiction.— The board of directors shall have power and they are hereby authorized, shall it be deemed necessary, to enter into a contract with the office of the United States Attorney General or such necessary federal agency, to keep, restrain, control, care, and train any negro girl under the age of sixteen years, being a citizen of the State of North Carolina, who may come within the jurisdiction of the several federal

*Conditional Release and Final Discharge of Inmates of Certain Training and Industrial Schools.*

§ 134-85. Conditional release.—The superintendent of the State Home and Industrial School for Girls, of the Stonewall Jackson Manual Training and Industrial School, of the Eastern Carolina Industrial Training School for Boys, and of the Morrison Training School for Negro Boys, shall have power to grant a conditional release to any inmate of the institution over which such superintendent presides, under rules adopted by the board of trustees or managers of such institution, and such conditional release may be terminated at any time by the written revocation of such superintendent, which written revocation shall be sufficient authority

[A2781]

for any officer of the school or any peace officer to apprehend any inmate named in such written revocation, in any county of the State, and to return such inmate to the institution from which he or she was conditionally released. Such conditional release shall in no way affect any suspended sentence, a condition of which is that the inmate be admitted to and remain at such institution. (1937, c. 145, s. 1.)

Editor's Note.—The Morrison Training School for Negro Boys is now known as the Morrison Training School. See §§ 134-79 and 134-91.

Cited in In re Burnett, 225 N. C. 646, 36 S. E. (2d) 75 (1945).

§ 134-86. **Final discharge.**—Final discharge of any inmate of any institution enumerated in § 134-85 may be granted by the superintendent of such institution, under rules adopted by the board of directors or managers, at any time after such inmate has been admitted to the institution: Provided, however, that final discharge must be granted before such inmate arrives at his or her twenty-first birthday. (1937, c. 145, s. 2.)

### ARTICLE 8.

#### *Care of Persons under Federal Jurisdiction.*

§ 134-87. **Certain correctional institutions to make contracts with federal agencies for the care of persons under federal jurisdiction.**—The governing boards of the Stonewall Jackson Manual Training and Industrial School, Morrison Training School for Negro Boys, Eastern Carolina Training School, the State Home and Industrial School for Girls, and the State Industrial Farm Colony for Women may contract with the office of the United States Attorney General, the Bureau of Prisons of the United States Department of Justice, or such necessary federal agency for the care, keeping, correction, training, education, and supervision of delinquent children or other persons under the jurisdiction, custody, or care of the federal courts or of the said office of the United States Attorney General, the Bureau of Prisons of the United States Department of Justice, or such necessary

federal agency, as authorized by the terms of the Federal Juvenile Delinquency Act of one thousand nine hundred thirty-eight, and may receive, accept, hold, train, and supervise such persons as may be received from said courts or department under the rules and regulations of the several and respective institutions as prescribed or as may hereafter be established by the said governing boards, provided, however that such contracts or subsequently established rules of care, procedure, and training, of those committed to said institutions, first shall have been approved by the State Board of Public Welfare. (1939, c. 166, s. 1.)

§ 134-91. **Powers and duties of the State Board of Juvenile Correction.**—The following institutions, schools and agencies of this State, namely, the Stonewall Jackson Manual Training and Industrial School, the State Home and Industrial School for Girls, Dobb's Farms, the Eastern Carolina Industrial Training School for Boys, the Morrison Training School, and the State Training School for Negro Girls, together with all such other correctional State institutions, schools or agencies of a similar nature, established and maintained for the correction, discipline or training of delinquent minors, now existing or hereafter created, shall be under the management and administrative control of the State Board of Juvenile Correction.

Wherever in §§ 134-1 to 134-48, inclusive, or in §§ 134-67 to 134-89, inclusive, or in any other laws of this State, the words "board of directors," "board of trustees," "board of managers," "directors," "trustees," "managers," or "board" are used with reference to the governing body or bodies of the institutions, schools or agencies enumerated in § 134-90, the same shall mean the State Board of Juvenile Correction provided for in § 134-90, and it shall be construed that the State Board of Juvenile Correction shall succeed to, exercise and perform all the powers conferred and duties imposed heretofore upon the separate boards of directors, trustees or managers of the several institutions, schools or agencies herein mentioned, and said powers and duties shall be exercised and performed as to each of the institu-

tions by the State Board of Juvenile Correction herein provided for. The said Board shall be responsible for the management of the said institutions, schools or agencies and the disbursement of appropriations made for the maintenance and permanent enlargement and repairs of the said institutions, schools or agencies subject to the provisions of the Executive Budget Act, and said Board shall make report to the Governor annually, and oftener if called for by him, of the condition of each of the schools, institutions or agencies under its management and control, and shall make biennial reports to the Governor, to be transmitted by him to the General Assembly, of all moneys received and disbursed by each of said schools, institutions or agencies.

The State Board of Juvenile Correction shall have full management and control of the institutions, schools and agencies named in this article, and shall have power to administer these institutions, schools and agencies in the manner deemed best for the interest of delinquent boys and girls of all races. Similar provisions shall be made for white and negro children in separate schools. Indian children shall be provided for in a manner comparable to that afforded children of the white and negro races. Individual students may be transferred from one institution, school or agency to another, but this authority to transfer individual students does not authorize the consolidation or abandonment of any institution, school or agency. The Board of Juvenile Correction, subject to the approval of the Governor and the Advisory Budget Commission, is authorized to transfer the entire population at Dobb's Farms to the State Home and Industrial School for Girls and to utilize the present facilities at Dobb's Farms as a training school for negro girls.

The State Board of Juvenile Correction is hereby vested with administrative powers over the schools, institutions and agencies set forth in this article, together with all lands, buildings, improvements, and other properties appertaining thereto, and the Board is authorized and empowered to do all things necessary in connection therewith for the care, supervision and training of boys and girls of all races who may be received at any of such schools, institutions or agencies. (1947, c. 226; 1963

§ 148-44. Segregation as to race, sex and age. —The commission shall provide separate sleeping quarters and separate eating space for the different races and the different sexes; and, in so far as it is practical to do so, shall provide for youth-

§ 153-201. Organization meeting; purchase of site; equipment; separation of races and sexes.—The board of trustees shall, as soon as possible, and not later than sixty days after appointment, meet and organize by electing a chairman and secretary. They shall proceed promptly with the purchase of a farm of suitable size, location and fertility, giving due consideration to sanitary surroundings and transportation facilities. They shall provide for the necessary stock, tools, and farm equipment, and shall cause to be erected suitable buildings for the housing, detention and keeping the prisoners assigned to said district farm, due regard being given to the separation of the sexes and races and such other plans for segregation as their judgment and existing conditions may suggest. (1931, c. 142, s. 3.)

§ 153-51. Jail to have five apartments.—The common jails of the several counties shall be provided with at least five separate and suitable apartments, one for the confinement of white male criminals; one for white female criminals; one for the colored male criminals; one for colored female criminals; and one for other prisoners. (Rev, s. 1336; Code, s. 783; R. C., c. 30, s. 2; 1705, c. 433, s. 4; 1816, c. 911; C. S. 1318.)